880 F.2d 1267
 FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, as Receiver
for Sunrise Savings and Loan Association, a
Federal Savings and Loan Association,
Plaintiff-Appellee,
v.
TWO RIVERS ASSOCIATES, INC., et al., Defendants,
Robert H. Smith, Defendant-Appellant.
 No. 88-5580.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 21, 1989.
 
 Elizabeth T. Maass, Alley, Maass, Rogers, Lindsay & Chauncey, Paul B. Erickson, Palm Beach, Fla., for defendant-appellant.
 Cary A. Woodfield, Squire, Sanders & Dempsey, Palm Beach, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before CLARK and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 This is an appeal from an order granting summary judgment of foreclosure in favor of the Federal Savings and Loan Insurance Corporation (FSLIC). The mortgages were executed by Two Rivers Associates ("Two Rivers") in favor of Sunrise Savings and Loan Association. Robert H. Smith, whose purchase money mortgage was subordinated to the mortgages owned by Sunrise, opposed the motion in the district court. Smith now appeals. We affirm.
 
 I.
 A. Facts
 
 2
 Two Rivers, a Florida corporation, was formed to develop the Schooner Oaks Project, a proposed condominium development in Martin County, Florida. The project initially was designed for 82 units, but was later expanded to 86 units. The principal officers of Two Rivers were Charles H. Pope and Fred W. Pearce. The land on which the project was to be built was sold to Two Rivers for $650,000 by Smith who accepted as consideration a promissory note in that amount secured by a purchase money mortgage.
 
 
 3
 In October 1982, Two Rivers received a commitment from Concordia Federal Savings and Loan Association to loan approximately $8 million to develop and construct the project. Despite this commitment, Two Rivers continued to negotiate with other institutions to gain financing under more favorable terms. Two Rivers approached Sunrise and Loan Association of Florida ("Old Sunrise") and requested that it provide acquisition, construction, and development financing for the Project.
 
 
 4
 A series of meetings with Old Sunrise culminated in the issuance of a Commitment Letter on June 13, 1983. Old Sunrise agreed to provide Two Rivers with a development and construction loan in the amount of $2.5 million. Two Rivers requested funding for the entire project in the amount of $10 million but the president of Old Sunrise, William Frame, told the principals of Two Rivers it would be easier for Old Sunrise to approve several smaller loans rather than one large loan. Pope affidavit, Record, Vol. 4, Tab 82, at 3. According to Pope, Pearce, and the loan officer of Old Sunrise, Joseph Zambruski, both parties agreed that Old Sunrise would fund the entire Schooner Oaks project. Id.; Pearce affidavit, Record, Vol. 3, Tab 69, Exh. 9; Zambruski affidavit, Vol. 3, Tab 81, Exh. 2.
 
 
 5
 That same day, Two Rivers sent a letter to Old Sunrise accepting the loan commitment, subject to several changes it requested. This "Letter of Clarification" stated that Two Rivers' acceptance of the commitment was conditioned on Old Sunrise's agreement to fund the entire Project.[1] Two Rivers also sought clarification of the provision in the Commitment Letter entitling Old Sunrise to $4000 profit from every unit sold; Two Rivers wanted Old Sunrise limited to profit from units which it financed. The parties thereafter signed a document entitled "First Amendment to the Mortgage Commitment Letter Dated June 13, 1983." The "First Amendment" stated that it superceded "all terms and conditions contained in the Original Commitment which conflict with the Amendment." Record, Vol. 4, Tab 82, Exh. 5. The Amendment does not explicitly state that Old Sunrise agreed to fund the entire project. In addition, the Amendment rejected Two River's view of the profit participation plan and provided that Old Sunrise was entitled to the $4000 profit on the sale of all condominium units regardless of whether it financed the construction.
 
 
 6
 The Amendment also required Smith's lien to be reduced to a purchase money mortgage in the amount of $400,000 with the remaining $250,000 to be evidenced by a corporate note and for the mortgage to be subordinated to Old Sunrise's mortgage and any future loans. Smith states in his affidavit that he was induced to subordinate his loans to Old Sunrise by its promise to fund the entire Schooner Oaks project. Record, Vol. 3, Tab 81, Exh. 1. Although he was not present at the meetings, his attorney Stephen Fraiser was and communicated Old Sunrise's promise to Smith. See Fraiser affidavit, Record, Vol. 3, Tab 81, Exh. 3; Pope affidavit, Record, Vol. 4, Tab 82.
 
 
 7
 In June 1983, therefore, Two Rivers closed on the initial loan of $2.5 million and executed a promissory note and mortgage ("The First Mortgage") which was duly filed. The mortgage contained a $10 million future advance clause. It also provided that any future loans would be cross-secured. In addition, the mortgage required Two Rivers to obtain Old Sunrise's consent before seeking other secured financing. As required, Smith reduced his purchase money mortgage to $400,000 and executed a written subordination agreement that gave a first lien to the Old Sunrise mortgage. It is significant that Smith did not require the subordination agreement to include the alleged promise by Old Sunrise "to fund the entire Schooner Oaks project." The subordination agreement, recorded in the public records, failed to notify the public and any interested party of the oral promise that Smith now relies upon in challenging FSLIC's mortgage foreclosure proceeding.
 
 
 8
 On January 4, 1984, the Old Sunrise loan committee approved an $800,000 future advance under this mortgage because of unanticipated costs. At this time, Old Sunrise also increased its profit participation requirement from $4000 to $4500 per unit sold. Smith again subordinated his purchase money mortgage to the Old Sunrise Future Advance. Record, Vol. 3, Tab 82, Exh. 10, 11.
 
 
 9
 In March 1984, Two Rivers requested loans for the construction of two more buildings. Old Sunrise submitted a Commitment Letter for a loan of $1.15 million. Due to a dispute over title insurance and the need for an updated appraisal, Old Sunrise refused to close under that Commitment Letter. However in October 1984, after receiving additional title insurance and submission of a new appraisal, Old Sunrise agreed to close on a $919,500 loan. Two Rivers executed a mortgage ("Second Mortgage") which was duly recorded. During the delay Smith loaned Two Rivers $7,000 to meet operating expenses; this loan was unsecured. Smith affidavit, Record, Vol. 3, Tab 81, Exh. 1. In February 1985, pursuant to a request for additional funds, Two Rivers executed a third mortgage ("Third Mortgage") for $1.471 million which was recorded. Both mortgages contained cross-default provisions. Smith subordinated his mortgage to both the Second and Third Mortgages.
 
 
 10
 Finally, in March 1985, Two Rivers applied to Old Sunrise for the funding of two additional buildings. By letter dated May 6, 1985, however, Zambruski notified Two Rivers that its interest reserve accounts with the Bank were near depletion and that Old Sunrise would neither advance more funds nor renegotiate the terms of the existing loans. Pope affidavit, Record Vol. 4, Tab 82.[2] Old Sunrise advanced no additional funds after that date. After this point, Smith loaned Two Rivers an additional $30,000 to meet expenses. That loan was also unsecured. Smith affidavit, Record, Vol. 3, Tab 81, Exh. 1.
 
 
 11
 Two months thereafter the Federal Home Loan Bank Board ("Bank Board") and the Florida Department of Banking declared Old Sunrise to be insolvent and in an unsafe and unsound condition to transact business. The FSLIC was appointed as a receiver and reorganized Old Sunrise into the Sunrise Savings and Loan Association ("New Sunrise") and transferred all of Old Sunrise's assets and liabilities to that institution. Among the assets were those related to the transactions with Two Rivers.
 
 
 12
 Two Rivers defaulted on the original loan by failing to make payments due August 1, 1985 and all subsequent payments. Two Rivers defaulted on the second loan by failing to make payment due September 1, 1985 and all subsequent payments. Finally, Two Rivers defaulted on the third loan pursuant to the cross-default provision.
 
 B. Procedural History
 
 13
 On March 3, 1986, New Sunrise commenced an action in the Circuit Court for Martin County, Florida, to enforce the promissory notes and foreclose the mortgages. By order dated June 27, 1986, the state court granted New Sunrise's motion for partial summary judgment finding the notes and mortgages to be valid, in default, and superior to any other claims. The court directed a public sale of the properties if the debt of $5,499,899.19 was not satisfied within three days. Record, Vol. 3, Tab 69, Exh. 12. The court also granted Two Rivers, Pearce, Pope, and Smith's motions to amend their answers on the condition that the amendment address issues not disposed of by the court's summary judgment of foreclosure. Id., Exh. 11.
 
 
 14
 Two Rivers, Pearce, and Pope filed amended answers asserting affirmative defenses and counterclaims relating to Old Sunrise's failure to fund the entire project; Smith's amended answer only raised defenses based on this agreement. In addition, all the defendants moved for reconsideration of the motion granting summary judgment. The circuit court subsequently stayed the foreclosure sale and set a briefing schedule on the motion for reconsideration of summary judgment. Id., Exh. 22. The defendants initially filed a notice of appeal to the Fourth District Court of Appeals but the appellate court relinquished jurisdiction to the lower court for forty-five days for a ruling on the motion to reconsider. Id., Exh. 24.
 
 
 15
 During that time, however, the Bank Board determined that New Sunrise was insolvent and on September 12, 1986, appointed the FSLIC as receiver for the purpose of liquidating its assets and making payment of its liabilities. Before the circuit court ruled on the motion for reconsideration, the FSLIC removed the action to the United States District Court for the Southern District of Florida pursuant to 12 U.S.C. Sec. 1730(k)(1)(C). On March 6, 1987, Smith filed a motion for leave to amend his amended answer to add counterclaims. That motion was denied on May 4, 1987.
 
 
 16
 On September 25, 1987, the FSLIC moved to dismiss the counterclaims asserted by Two Rivers and for summary judgment. In opposition, Smith argued to the district court that there were factual disputes which precluded summary judgment.[3] He asserted that because Old Sunrise had breached its loan agreement by failing to disburse funds under the Third Mortgage and also breached its obligation to fund the entire project, Old Sunrise was not entitled to the equitable remedy of foreclosure. He contended that his mortgage should be made superior to the Old Sunrise mortgages.[4] On June 7, 1988, the district court granted summary judgment.[5] The district court held that there was no dispute of material facts precluding foreclosure under Florida law. Moreover, the court held that the defendants were estopped from asserting any affirmative defenses to their obligations under the promissory notes under D'Oench, Duhme, & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), because the defenses were based on a "secret" agreement between the savings and loan and the mortgagor. Finally, relying on North Mississippi Savings & Loan Ass'n v. Hudspeth, 756 F.2d 1096, 1102 (5th Cir.1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986), the district court dismissed the counterclaims asserted by Two Rivers[6] on the basis that 12 U.S.C. Sec. 1729(d) and 12 U.S.C. Sec. 1464(d) divest the district court of jurisdiction to hear counterclaims until administrative remedies have been exhausted.
 
 II. DISCUSSION
 
 17
 The issue on appeal is whether summary judgment was appropriate in light of the defenses and counterclaims asserted by Smith. More specifically, Smith argues that he submitted evidence that demonstrates that Old Sunrise defaulted on its obligations to fund under the Third Mortgage and its agreement to fund the entire Schooner Oaks project. We conclude that summary judgment was properly granted because the affidavits do not support Smith's argument that Old Sunrise breached its obligations under the Third Mortgage. As to the second point, although there is a factual dispute about whether Old Sunrise breached an agreement to fund the entire project, the FSLIC was entitled to summary judgment as a matter of law because the agreement to fund was not reflected in the public records governing land transactions in Martin County Florida nor in the records of the savings and loan.
 
 A.
 
 18
 Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a decision granting or denying summary judgment, this court applies the same standard as applied by the district court. Clemons v. Dougherty County, 684 F.2d 1365, 1369 (11th Cir.1982). The party seeking summary judgment must bear the initial responsibility of identifying the portions of the record which demonstrates the absence of a genuine issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party then must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' " Id. Finally, the court must view the evidence in the light most favorable to party opposing the motion and draw all reasonable inferences from the facts in favor of the nonmovant. Clemons, 684 F.2d at 1369.
 
 
 19
 In this case, the FSLIC presented the district court with affidavit of A.E. Elroy, the Vice President of New Sunrise, which stated that Two Rivers defaulted on both the First and Second Mortgage by failing to make payments in August and September 1985 respectively and that through the cross-default provisions, Two Rivers defaulted on the Third Mortgage. Under Florida law, the failure to make a timely installment payment entitles the holder of a note and mortgage to foreclose in accordance with the terms of the instruments. David v. Sun Federal Savings & Loan Ass'n, 461 So.2d 93, 96 (Fla.1984); Pezzimenti v. Cirou, 466 So.2d 274, 276 (Fla.Dist.Ct.App.1985). However, the equitable remedy of foreclosure may be denied if the holder of the note comes to the court with unclean hands or the foreclosure would be unconscionable. See Walter Harvey v. O'Keefe, 346 So.2d 617, 618 (Fla.Dist.Ct.App.1977); VAC Development Corp. v. Abelleira, 330 So.2d 791, 792 (Fla.Dist.Ct.App.1977); Pelle v. Glantz, 349 So.2d 732, 734 (Fla.Dist.Ct.App.1977); Federal Home Loan Mortgage Corp. v. Taylor, 318 So.2d 203, 208 (Fla.Dist.Ct.App.1975).
 
 
 20
 In opposing summary judgment, Smith contends that there is a dispute about whether Old Sunrise breached its obligation to dispense funds under the Third Mortgage. Smith argues that because of this breach his mortgage should be made superior to the Old Sunrise mortgages. The FSLIC contends that Old Sunrise did not breach its obligation under the loan agreement but Smith asserts that the affidavits show that Old Sunrise wrongfully refused to advance funds committed under the Third Mortgage. Although Old Sunrise informed Two Rivers that its interest reserves were almost depleted, a memorandum from the Old Sunrise files indicates that the interest reserves were not depleted at that time. At first blush, it seems that there is a factual dispute which should preclude summary judgment. However, neither the affidavits nor the documentary evidence in the record support even a reasonable inference that Old Sunrise breached an agreement to disburse funds already committed to Two Rivers under the Third Mortgage. Instead, the affidavit indicate that after May 6, 1985, Old Sunrise refused to lend additional funds to complete the entire project.
 
 
 21
 Pope's affidavit is the only affidavit which arguably supports Smith's recitation of the facts.[7] Pope states that the Third Mortgage executed in February 1985 was requested for the construction of buildings F and J but the Commitment Letter and the Mortgage state that it was for the construction of buildings F, J, and Q. Record, Vol. 4, Tab 82, Exh. 21. Pope states that Two Rivers then applied to Old Sunrise for a loan for the construction of two additional buildings--buildings W and X--in March 1985. He engaged in negotiations with Old Sunrise but on May 6, Old Sunrise indicated to Two Rivers that "we will be unable to extend any additional credit, and/or modify any existing loans to provide for additional interest." Record, Vol. 4, Tab 82, Exh. 23 (emphasis added). Pope's affidavit does not state that after this letter, Old Sunrise failed to disburse funds already committed under the Third Mortgage, it only states "Old Sunrise provided no further funding after May 6, 1985." In light of the rest of his affidavit and the record, the only reasonable inference is that Old Sunrise refused to loan funds for buildings W and X after May 6, 1985.[8] Thus, the affidavit does not raise a factual dispute about whether Old Sunrise complied with the Third Mortgage. Instead, the affidavits and documentary evidence indicate a real dispute about whether Old Sunrise's refusal to fund additional loans was wrongful and breached an agreement to fund the entire Schooner Oaks project. We turn to that issue.
 
 B.
 
 22
 Smith has produced affidavits from Pope, Pearce, his attorney Fraiser, and the loan officer from Old Sunrise, Zambruski, stating that Old Sunrise agreed to fund the entire project. This agreement was not in writing. The parties do not address whether Florida's parol evidence rule would permit consideration of Old Sunrise's alleged oral promise to vary the written notes, mortgage and subordination agreements. Smith does not claim that his subordination agreements were procured by fraudulent means, which might be a basis of such evidence being considered by a court. Pena v. Tampa Federal Savings & Loan Ass'n, 363 So.2d 815 (Fla.Dist.Ct.App.1978), cert. denied, 373 So.2d 461 (1979). Instead of relying on this defense, the FSLIC contends that under the federal common law, Smith is estopped from asserting his defenses and counterclaims based on the agreement because the agreement was not reflected in Old Sunrise's records.[9]
 
 
 23
 In D'Oench, Duhme & Co. v. FDIC, the FDIC sued for payment on a note it assumed when a bank failed. The note was executed by D'Oench, Duhme, a brokerage firm, so that the bank could cover a loss from bonds it had bought from the firm. The receipt for the note which was not contained in the bank records indicated that the note was given with the understanding that it would never be called for payment. 315 U.S. at 454, 62 S.Ct. at 678. The defendant asserted the agreement and lack of consideration as defenses to liability. The Supreme Court held that the defendant was estopped from raising defenses based on this "secret agreement." Id. at 461, 62 S.Ct. at 681.
 
 
 24
 The Supreme Court first held that liability on the note was determined by federal common law rather than state law because of the federal policy to protect "[the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insures or to which it makes loans." Id. at 457, 62 S.Ct. at 679. This policy was best served by refusing to allow a defendant to assert as a defense any agreement that was intended to "deceive the creditors or the public authority or would tend to have that effect." Id. at 460, 62 S.Ct. at 681. Finally, the Court held that the defendant did not have to intend to deceive the creditors; it was enough "that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." Id.
 
 
 25
 There is no doubt that if D'Oench, Duhme applies in this case, it would bar Smith's defenses and counterclaims. If the agreement to fund the entire Schooner Oaks project was not reflected in the Old Sunrise's records, it is clear that the FSLIC would have been misled about Old Sunrise's financial condition.[10] In addition, Smith associated himself with the arrangement which mislead the FSLIC. The Supreme Court recently stated that
 
 
 26
 Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme to mislead the banking authorities, whether the condition consists of a counterpromise (as in D'Oench, Duhme ) or of the truthfulness of a warranted fact.
 
 
 27
 Langley v. FDIC, 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1988). In Langley, the Court held that 12 U.S.C. Sec. 1823(e), which provides that an agreement is not valid against the FDIC unless it is in writing, estops a defendant from raising the defense of misrepresentation. Id. at 93-94, 108 S.Ct. at 402. In concluding that the term "agreement" included a misrepresentation, the Court held that section 1823(e) was meant to offer as much protection to the FDIC as the common law rule in D'Oench, Duhme. Id. at 91, 108 S.Ct. at 401.
 
 
 28
 Here Smith was actively involved in the negotiations between Old Sunrise and Two Rivers and could have insisted that the agreement be explicitly stated in any of the many loan documents. Id. at 94-95, 108 S.Ct. at 403. Thus the D'Oench, Duhme doctrine may bar his defenses. Compare FSLIC v. Murray, 853 F.2d 1251, 1255 (5th Cir.1988) (defendants estopped from raising defense of material alteration when they signed blank signature forms which were later appended to different document); FDIC v. McClanahan, 795 F.2d 512, 516 (5th Cir.1986) (when maker of note signed blank promissory note and gave it to someone he knew was convicted of bank fraud, he was estopped from raising defenses under D'Oench, Duhme ) and FDIC v. Investors Associates X, 775 F.2d 152, 155 (6th Cir.1985) (defendant estopped from raising fraud defense when he signed blank note) with FDIC v. Meo, 505 F.2d 790, 793 (9th Cir.1974) (defendant not estopped from asserting defense of lack of consideration when he had no reason to know that bank had not complied with his request).
 
 
 29
 Smith advances two arguments why the D'Oench, Duhme doctrine does not apply. Notably, Smith does not argue that the D'Oench, Duhme doctrine is inapplicable to the FSLIC and we agree with the Fifth, Sixth, Eighth and Tenth Circuits that since the FSLIC has parallel duties and power with respect to savings and loans as the FDIC has with banks,[11] the federal policy should protect the FSLIC to the same extent it protects the FDIC. See Mainland Savings Ass'n & FSLIC v. Riverfront Associates, Ltd., 872 F.2d 955, 956 (10th Cir.1989); First South, F.A., v. Aqua Construction Inc., 858 F.2d 441, 442 (8th Cir.1988); Murray, 853 F.2d at 1253; Andrew D. Taylor Trust v. Security Trust Federal Savings & Loan & FSLIC, 844 F.2d 337, 342 (6th Cir.1988). Instead, Smith argues that the doctrine is inapplicable because the agreement to fund the entire project is not a "secret agreement." He also argues that D'Oench, Duhme should not apply to the FSLIC when it is acting in its receivership capacity as it was in this case.
 
 1.
 
 30
 As the D'Oench, Duhme Court held, the federal common law protects the FDIC from misrepresentations as to the financial conditions of the institutions which it insures. In Langley, the Supreme Court emphasized that the purpose of section 1823(e), and by implication the D'Oench, Duhme doctrine, is to allow the FDIC to rely on bank records both when insuring the bank and when taking over a failed bank. The Court stated that "[n]either the FDIC nor the state banking authorities would be able to make a reliable evaluation if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." 484 U.S. at 91-92, 108 S.Ct. at 401; Gunter v. Hutcheson, 674 F.2d 862 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); see also FDIC v. Castle, 781 F.2d 1101, 1108 (5th Cir.1986) (quoting FDIC v. Powers, 576 F.Supp. 1167 (N.D.Ill.1983), aff'd, 753 F.2d 1076 (7th Cir.1984)).[12] If however, the records of a bank evidence all the obligations of the bank, the regulating authority will not be deceived. Thus, D'Oench, Duhme does not bar the assertion of defenses based on a bilateral obligation which appears in the bank's records. See Howell v. Continental Credit Corp, 655 F.2d 743, 746 (7th Cir.1981).
 
 
 31
 Smith argues that the loan documents indicate that Old Sunrise had agreed to fund the entire Schooner Oaks project. In support of his argument, Smith relies mainly on the contents of the Letter of Clarification and First Amendment. In addition, he points to specific provisions in the loans and mortgages which he contends supports a finding that Old Sunrise agreed to finance the entire project. We disagree.
 
 
 32
 In the Letter of Clarification, Two Rivers stated, "[o]ur acceptance is expressly conditioned on your agreement to provide us further funding for construction of the condominium units based on terms and conditions substantially as follows. You will make a loan of approximately $550,000 each four unit building[.]" Record, Vol. 4, Tab 82, Exhibit 4. Although this evidences Two Rivers' intent, it does not establish an obligation on the part of Old Sunrise. In fact, there is no explicit acceptance of that condition anywhere in the First Amendment which supercedes "all terms and conditions contained in the Letter of Clarification." Record, Vol. 4, Tab 84, Exhibit 5. Smith argues that the Amendment evidences an acceptance because in its modified profit participation provision, it states that the $4000 per unit was given in consideration for "providing this Loan and agreeing to provide a Construction Loan Commitment." Id. We do not agree. Although this statement evidences Old Sunrise's obligation to provide an additional Construction Loan Commitment, it does not indicate the terms of any construction loan and most importantly, there is no mention that such a loan commitment would be for the entire Schooner Oaks project. The focus of the inquiry in this case is whether the FSLIC had notice of the obligation to fund the entire project. This is not a case like Howell where the leases on which the suit was based "clearly manifest[ed] the bilateral nature of the lessee's and lessor's rights and obligations." 655 F.2d at 747. At no point in the many different documents evidencing the loans at issue is there an explicit acceptance of the obligation to fund the entire project. This one ambiguous reference to a further construction loan is not sufficient to allow Smith to advance defenses against the FSLIC about an agreement to fund the entire project.
 
 
 33
 Without the explicit statement of an obligation, Smith is forced to argue that certain provisions in the loan agreements evidence the agreement to fund the entire project. These provisions at most reflect that Old Sunrise intended to loan additional funds; they fall far short of establishing that Old Sunrise was obligated to fund the entire project.[13] For example, the fact that Old Sunrise required its consent before Two Rivers obtained alternative financing and created economic disincentives to obtaining outside financing does not evidence an agreement to fund the entire project. In fact it may indicate a contrary intent, for Old Sunrise was entitled to receive $4500 per unit from the sale of all units regardless of whether it financed the construction of the unit.
 
 
 34
 Smith's arguments might be appropriate in a suit against Old Sunrise where the issue was whether Old Sunrise ever agreed to fund the entire project. In such a case, the terms of the contract might be sufficient when added to the supporting extrinsic evidence (if admissible) to find that the parties agreed that Old Sunrise would fund the entire project. These arguments, however, are not sufficient in this case to survive summary judgment against the FSLIC. In this case, the question is whether the FSLIC was put on notice of any agreement that Old Sunrise was obligated to fund the entire project. Since the bank records did not reflect the unrecorded, unwritten, "secret" agreement, Smith's first argument against applying the D'Oench, Duhme doctrine fails. Langley, 484 U.S. at 94, 108 S.Ct. at 402.
 
 2.
 
 35
 Smith's second argument is that D'Oench, Duhme should not apply when the FSLIC is acting in its capacity as a receiver rather than in its corporate capacity. When the FSLIC decides to liquidate the institution's assets and sues on a note, it is suing in its capacity as a receiver. The FSLIC sues in its corporate capacity when it sues on a note that it assumed during a purchase and assumption transaction to save the failed institution.[14] Other courts have not hesitated to apply D'Oench, Duhme to cases in which the FSLIC is acting in its role as a receiver rather than a corporate insurer. See Mainland Savings, 872 F.2d at 956; Murray, 853 F.2d at 1252; Federal Savings & Loan Ins. Corp. v. (5th Cir.1988) Lafayette Investment Properties, 855 F.2d at 196; First South, 858 F.2d at 441; see also McClanahan, 795 F.2d at 514 n. 1 (although section 1823(e) only applies to the FDIC in corporate capacity, D'Oench, Duhme applies when the FDIC is acting in its receivership capacity). However, in Gunter v. Hutcheson, this court held that federal common law protects the FDIC from assertion of fraud defenses only when it is operating in its corporate capacity. In Gunter, the makers of a note sued the FDIC for rescission of a note obtained pursuant to a purchase and assumption transaction alleging that the bank officers fraudulently misrepresented the financial condition of the bank. Id. at 866. The court limited it holding to the FDIC as a corporate insurer because in such a case the FDIC needs to rely on the bank records to determine whether to liquidate the failed bank or to pursue a purchase and assumption. Id. at 872-73. In addition, the court distinguished FDIC v. Meo, 505 F.2d 790 (9th Cir.1974), in a footnote on the grounds that the FDIC had acted in its capacity as a receiver in that case. Id. at 873 n. 15.
 
 
 36
 Gunter does not require us to hold D'Oench, Duhme inapplicable to the FSLIC in its receivership capacity. First, the Gunter holding is undercut by Langley for the Gunter court only reached the issue of federal common law because it concluded that section 1823(e) did not estop a defense of fraudulent inducement. 674 F.2d at 867. That conclusion was rejected by the Langley court. 484 U.S. at 93, 108 S.Ct. at 402. In addition, as noted supra, Meo is distinguishable on its facts. Furthermore, we note that Gunter limited the holding to the FDIC acting in its corporate capacity because of the need to rely on the bank records to determine whether to liquidate or engage in a purchase and assumption transaction. 674 F.2d at 873. That need is no different when the FDIC or the FSLIC is acting in its receivership capacity. Indeed, in this case the FSLIC relied on the bank records in choosing to liquidate rather than pursue a purchase and assumption transaction. Id.; see Murray, 853 F.2d at 1256. Finally, the Supreme Court emphasized in Langley that the federal policy protects the FDIC or the FSLIC's reliance on the bank records even before the institution fails. 484 U.S. at 94-95, 108 S.Ct. at 403. The Court recognized that one of the harms which this rule protects against "occurs no later than the time at which [the FSLIC] conducts its first bank examination that is unable to detect the unrecorded agreement." Id. at 95, 108 S.Ct. at 403. Thus, the reasoning behind D'Oench, Duhme requires that it be applied to protect the FDIC and the FSLIC regardless whether the regulatory body is acting in its capacity as a receiver or as a corporate insurer.[15]
 
 III. CONCLUSION
 
 37
 We hold that summary judgment was appropriately granted for the FSLIC; there were no disputes of material fact which precluded summary judgment and the FSLIC was entitled to judgment as a matter of law. The district court correctly held that Smith was estopped from raising his defenses because they were based on an agreement that was not reflected in the records of Old Sunrise. Finally, since the district court erred in holding that the court did not have jurisdiction to consider Smith's counterclaims, that portion of the opinion is vacated. However, since the counterclaims were also based on the same "secret agreement" as the defenses, the defendant is also estopped from asserting them. Therefore, the district court's order granting summary judgment is AFFIRMED.
 
 
 
 [1]
 The letter stated
 Our acceptance is expressly conditioned on your agreement to provide us further funding for construction of condominium units based on terms and conditions substantially as follows. You will make a loan of approximately $550,000 on each four unit building, allocated as follows: approximately $120,000 to pay down the acquisition and development loan of $2.5 million; approximately $350,000 for hard costs of construction of buildings; approximately $80,000 for soft costs per building.
 Record, Vol. 4, Tab 82, Exh. 4.
 
 
 [2]
 The letter stated
 Please be advised that according to our records and projections, the interest reserve in your loan has been depleted or will be depleted in the near future. Under our current policies and guidelines we will be unable to extend any additional credit, and/or, modify any existing loan to provide additional interest. As a result, please make arrangements accordingly to maintain the interest payments on the loan.
 Record, Vol. 3, Tab 82, Exh. 23.
 
 
 [3]
 Neither Two Rivers, Pope, nor Pearce opposed the summary judgment motion in the federal court
 
 
 [4]
 The counterclaims Smith attempted to assert were also based on the alleged agreement to fund the entire project. The counterclaims were for breach of contract, fraud, and breach of fiduciary duty by a joint venturer. Record, Vol. 1, Tab 16
 
 
 [5]
 The district court entered a final summary judgment of foreclosure on June 15, 1988 which was subsequently amended on July 8, 1988, to correct the legal description of the property. On September 13, 1988, a public sale of the secured property was conducted and FSLIC was the successful bidder. On November 2, 1988, the district court entered an order confirming the sale
 
 
 [6]
 Smith's motion to amend his answers to assert counterclaims had been already denied
 
 
 [7]
 The defendants originally filed affidavits from Pope, Pearce, and Smith in state court. Pope and Pearce's affidavits merely state that after June 1985, Old Sunrise refused to advance "additional funding for the acquisition, development, and construction of the project." Pearce affidavit, Record, Vol. 3, Tab 69, Exh. 19; Pope's initial affidavit, id., Exh. 20. Smith's affidavit does not mention the alleged breach. After removal to federal court and further discovery, Smith filed a supplemental response to the motion for summary judgment with an expanded affidavit from Pope which describes the transactions in more detail. Pope affidavit, Record, Vol. 4, Tab 82
 
 
 [8]
 For example, after receiving this letter Pope wrote to Old Sunrise to inquire about the failure to fund the construction of buildings W and X. Id., Exh. 24
 
 
 [9]
 The district court held that it had no jurisdiction to consider unexhausted counterclaims against the FSLIC. The Supreme Court rejected this holding in Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corp., --- U.S. ----, ----, 109 S.Ct. 1361, 1371, 103 L.Ed.2d 602 (1989). However, because the counterclaims in this case are based on the allegation that Old Sunrise breached its obligation to fund the entire Schooner Oaks Project, the counterclaims are barred to the same extent as the defenses
 
 
 [10]
 Smith argues that the absence of the agreement would not have overvalued Old Sunrise's assets because Two Rivers would have executed promissory notes and mortgages for the additional loans and because Old Sunrise would have received profit from the construction of additional buildings. This argument misses the point. First, Old Sunrise was entitled to the profits regardless of whether it funded the entire project. Moreover, the funding of the entire project would have cost at least $10 million. If the records did not reflect Old Sunrise's commitment to lend an additional $5 million, it is hard to see how the FSLIC would not have been misled about the financial condition of the institution
 
 
 [11]
 Compare 12 U.S.C. Sec. 1729(f) (detailing FSLIC's powers when savings and loan is insolvent) with 12 U.S.C. Sec. 1823(c) (FDIC's powers when bank fails)
 
 
 [12]
 Thus the Supreme Court held that the FDIC's actual knowledge of the misrepresentation when it acquires the note is irrelevant. Langley, 484 U.S. at 94-95, 108 S.Ct. at 402-03; see Taylor Trust, 844 F.2d at 343; Investors Associates X, 775 F.2d at 155. Therefore, Smith's argument that the D'Oench, Duhme is inapplicable because the FSLIC had actual knowledge of the obligation at the time it acquired the note is without merit
 
 
 [13]
 Indeed, most of the provisions merely are terms which are favorable to Old Sunrise. For example, Smith points out that without the construction and sale of a substantial number of units, Two Rivers would be unable to pay back the initial $2.5 million loan in two years. Although Smith argues that this evidences Old Sunrise's intent to fund the entire project, for it would not enter into a loan that could not be repaid, the flaw in his argument is that there is no obligation to fund the entire project apparent from the loan
 
 
 [14]
 When faced with a failed savings and loan, FSLIC, like the FDIC, may act as a receiver and liquidate the assets and pay the depositors up to their insured amounts. Alternatively, FSLIC may employ a "purchase and assumption" transaction in which another institution purchases the assets of the failed bank. The purchase and assumption agreement may not require the purchasing institution to purchase certain assets. Those assets are then sold by FSLIC in its receivership capacity to FSLIC in its corporate capacity with the funds provided by the insurance fund. FSLIC, in its corporate capacity, may sue for payment. See generally, Gunter, 674 F.2d at 965 (explaining purchase and assumption by FDIC)
 
 
 [15]
 Our statement in Trigo v. FDIC, 847 F.2d 1499, 1502 n. 4 (11th Cir.1988), that state law rather than federal law controls the rights and liabilities of the FDIC as a receiver does not require a different result. First, the statement was dicta for the FDIC was acting in its corporate capacity in that case. In addition in Trigo, the D'Oench, Duhme doctrine might not have been available because the makers of the note were asserting claims based on bilateral obligations evident from the contract. Id. at 1503. Finally, the court relied on Gunter to state that federal policy is not strong when the FDIC is acting in its receivership capacity. Langley and the above discussion shows that such a conclusion is unwarranted