**TIMBERLAND DESIGN INC. and William C. Barnsley, Plaintiffs,**

**v.**

**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Liquidating Agent for First Service Bank for Savings, Defendant.**

**Civ. A. No. 89–40032–XX.**

United States District Court, D. Massachusetts.

July 31, 1990.

As Corrected Aug. 23, 1990.

---

Henry A. Brown, Potters & Sands, Boston, Mass., for plaintiffs.

Robert J. Stillman, Ropes & Gray, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Defendant Federal Deposit Insurance Corporation ("FDIC"), as liquidating agent for the First Service Bank for Savings ("First Service"), brings motions seeking a) to establish that plaintiffs Timberland Design, Inc. ("Timberland") and William C. Barnsley may not enforce a $3.9 million purported oral loan commitment with First Service and b) to recover a judgment of some $5.7 million in principal and accrued interest for monies First Service actually extended to the plaintiffs, pursuant to written promissory notes.

### I

On December 7, 1987, First Service, a Massachusetts savings bank, loaned Timberland $4 million to develop seven hundred fifty acres in southern New Hampshire. The note for the loan was executed by Timberland and was secured by the written personal guarantee of Timberland's principal, William C. Barnsley. At the same time, plaintiffs contend, First Service orally committed to lend Timberland an additional $3.9 million in May, 1988. First Service's books and records do not reflect the oral commitment. First Service did, however, pursuant to another promissory note, jointly executed by Timberland and Barnsley, provide another $500,000 to Timberland to build roads and thus obtain building permits. Neither Timberland nor Barnsley have made any payments of principal or interest on the monies actually extended by First Service.

First Service never provided Timberland with the monies which are the subject of its alleged oral commitments and plaintiffs brought this suit to enforce First Service's oral agreements. The FDIC has been approved as liquidating agent for First Service and substituted for First Service as the defendant. FDIC answered the Timberland complaint contending that the oral commitments were unenforceable and counterclaiming for repayment of the principal and interest due under the loans actually made. The plaintiffs in turn defend against repayment by contending affirmatively that the failure to satisfy the oral loan commitment relieves them of the repayment obligation.

FDIC now presses separately before me a motion for summary judgment against plaintiffs' claim-in-chief on the oral agreement, a motion to strike the plaintiffs' affirmative defenses and a motion for summary judgment on its counterclaim. The disposition of each motion turns on the enforceability of the oral loan commitment alleged by plaintiffs.

### II

FDIC contends that oral lending agreements of the type alleged by plaintiffs are unenforceable against the FDIC for two reasons: (A) the doctrine established in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and (B) 12 U.S.C. § 1823(e).

#### A

In *D'Oench*, the Supreme Court held in an opinion by Justice Douglas that a borrower could not rely on a "secret" agreement with the lender as a defense to an action brought by the FDIC to recover on a loan. 315 U.S. at 460, 62 S.Ct. at 680. The borrower in *D'Oench* agreed to execute a note in favor of the bank if the bank agreed not to collect on the note. The bank recorded the note, instead of the defaulted bonds previously sold to the bank by the borrower, apparently in an effort to inflate its assets prior to a bank examination. *Id.* at 454, 62 S.Ct. at 678. When the FDIC attempted to enforce the note

against the borrower, the borrower relied in defense upon the bank's agreement never to collect on the note.

The Supreme Court rejected the defense "because of the federal policy ... to protect [the FDIC] from misrepresentations ... as to the genuineness or integrity of securities in the portfolios of banks which it insures." *Id.* at 459, 62 S.Ct. at 680. The Court held that "the fact that creditors may not have been deceived or specifically injured is irrelevant." The test was framed as whether the agreement between the borrower and the FDIC insured bank "would tend to have th[e] effect" of deceiving the FDIC. *Id.* at 460, 62 S.Ct. at 681. In this connection, the Court concluded that "[i]t would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [FDIC] relied in insuring the bank was or was likely to be misled." *Id.*

The First Circuit has held broadly that the federal estoppel doctrine established in *D'Oench* applies if the arrangement is "capable of misleading the FDIC in its assessment of a bank's financial condition." *FDIC v. P.L.M. International, Inc.*, 834 F.2d 248, 252 (1st Cir.1987).

■ The purported oral arrangement to provide an additional $3.9 million was never recorded in First Service's accounts. The failure to record the $3.9 million loan commitment created an inaccurate picture of the bank's assets. This multi-million dollar agreement was plainly material to the FDIC in its assessment of First Service's financial condition. The omission of the arrangement from the records of the bank would, at the least, have a tendency to mislead the FDIC.

Plaintiffs do not dispute that the *D'Oench* doctrine, if applied, would be dispositive against them. Instead, they contend the doctrine is not applicable. Plaintiffs argue first that this federal estoppel doctrine is limited to actions brought by the FDIC in its corporate capacity. Neither precedent nor policy supports plaintiffs' argument.

To be sure, the two most recent First Circuit cases applying the federal estoppel doctrine established in *D'Oench* have arisen in circumstances where the FDIC was acting in its corporate capacity. *See FDIC v. Municipality of Ponce*, 904 F.2d 740, 745–46 (1st Cir.1990); *P.L.M. International, Inc.*, 834 F.2d at 252–53. But neither case limited its holding to those circumstances. Rather, the First Circuit in *P.L.M. International* used broad language in outlining the test for applying the estoppel doctrine: "the rule prohibits *all* 'secret agreement[s]' which enable the parties to undermine the federal policy of protecting the FDIC." 834 F.2d at 253 (emphasis added) (quoting *D'Oench*). That outline comprehends the FDIC in both its corporate and receiver capacity. Other circuits have not hesitated in applying *D'Oench* to the FDIC in its capacity as receiver. *FDIC v. McClanahan*, 795 F.2d 512, 514 n. 1 (5th Cir.1986); *FDIC v. First National Finance*, 587 F.2d 1009, 1012 (9th Cir.1978); *see also FSLIC v. Two Rivers Associates, Inc.*, 880 F.2d 1267, 1276 (11th Cir.1989) (applying *D'Oench* to FSLIC in receiver capacity).

From a policy perspective, plaintiffs argue that the underlying purpose of the *D'Oench* doctrine is the protection of the FDIC when it purchases assets quickly in its corporate capacity. The *D'Oench* doctrine, plaintiffs contend, is unnecessary when the FDIC acts as receiver. Plaintiffs overlook, however, the much broader policy grounds for the estoppel doctrine: protection of depositors and the deposit insurance program. Irrespective of whether the FDIC ultimately acts in a corporate or a receiver capacity, the protection of the integrity of the deposit insurance program requires that the FDIC be able to rely on bank records when it examines banks. The role of the estoppel doctrine in securing reliability is not limited to the FDIC's corporate manifestations. *D'Oench* itself recognized the federal policy of "protecting [the FDIC] in its various functions." 315 U.S. at 461, 62 S.Ct. at 681. I conclude that the doctrine applies to the FDIC as receiver.

Plaintiffs seek to distinguish *D'Oench* by suggesting narrow definitions for certain

of the vivid words employed by Justice Douglas in his opinion. For example, they note that *D'Oench* explicitly requires a "secret" agreement. Apparently, plaintiffs contend that their oral agreement was not a "secret" agreement because it was openly negotiated among the signatories. But for purposes of *D'Oench* analysis, a secret agreement is one that is unknown to those examining the bank's records. The unwritten and unrecorded agreement was unknown to the bank examiners and the FDIC. It was plainly kept a secret from them.

Plaintiffs also note that in *D'Oench* a borrower is said to be responsible when he has "lent himself to a scheme or arrangement." 315 U.S. at 460, 62 S.Ct. at 681. Based on this statement, they contend that the estoppel doctrine only operates against borrowers who are at fault. The Eleventh Circuit once made such a suggestion. *See Gunter v. Hutcheson*, 674 F.2d 862, 872 n. 14 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (*D'Oench* doctrine requires an "element of fault on the part of the obligor"). That dicta does not, however, appear to apply currently in the Eleventh Circuit. *Two Rivers Associates*, 880 F.2d at 1277 (11th Cir.1989) (questioning validity of *Gunter* in light of holding in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1988)). Other circuits, moreover, have applied the *D'Oench* doctrine when the borrower was innocent of any specific wrongdoing. *Bell & Murphy & Associates, Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 754 (5th Cir.1990) (under *D'Oench* "it is irrelevant ... whether [the borrower] acted in good faith and even whether [the borrower] was 'coerced,' or under 'economic duress' "); *FDIC v. Investors Associates X, Ltd.*, 775 F.2d 152, 155 (6th Cir.1985) ("*D'Oench* estoppel will apply regardless of the maker's intent"). *FDIC v. First National Finance Co.*, 587 F.2d 1009, 1012 (9th Cir.1978) ("it is not necessary for the accommodation maker to have knowledge of the specific scheme or fraudulent arrangement" to apply *D'Oench*).

Even accepting the Eleventh Circuit's footnote dicta in *Gunter* as requiring some sort of misfeasance, it is still fair to hold Timberland at fault because it did not insist on a written agreement for a multi-million dollar loan. *See Bell & Murphy*, 894 F.2d at 754 ("borrower could have protected itself by insisting that the bank properly record the agreement"). Parties claiming rights under an unwritten agreement " 'must be presumed to know that [the unwritten agreement] will conceal the truth from the vigilant eyes of the bank examiners.' " *FDIC v. First National Finance Co.*, 587 F.2d at 1012 (quoting *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 680).

*D'Oench* itself imposed no demanding fault standard upon a borrower whose transaction with a bank was misrepresented by the bank in its books and records.

> Though petitioner was not a participant in this particular transaction and, so far as appears, was ignorant of it, nevertheless it was responsible for the creation of the false status of the note in the hands of the bank.... If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose [of the FDIC] statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible.

315 U.S. at 461, 62 S.Ct. at 681.

In short, under *D'Oench* a borrower "lends" itself to a scheme when it engages in a transaction which makes the scheme possible. To the degree some fault on the part of the borrower is necessary to implicate *D'Oench*, the failure of Timberland to insist upon reducing the purported $3.9 million loan commitment to a recordable and recorded writing provides the necessary predicate.

Accordingly, I find the federal common law as it has evolved from *D'Oench* supports the FDIC's motions for summary judgment.

## B

■ Because of my decision that *D'Oench* controls and bars the plaintiffs' claim, I am not required to reach the difficult issue of retroactive application of sec-

tion 1823(e), except to note my view how the recent amendment to the scope of that provision affects my determination that *D'Oench* controls.

Section 1823(e) now provides that:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or Section 11 [12 U.S.C. § 1821] either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

The agreement here does not meet any of the requirements of section 1823(e).

The FDIC acknowledges that the current version of section 1823(e) did not apply to actions involving the FDIC as receiver until August 1989 (several months after this suit was filed) when Congress passed the Financial Institution Recovery, Reform and Enforcement Act ("FIRREA").[1] The FDIC, however, contends that the revision in the scope of § 1823(e) to include the FDIC in its receiver capacity should be applied retroactively or retrospectively.

The plaintiffs argue, to the contrary, that the amended statute should not be given retroactive application.

The Supreme Court appears to have developed two somewhat inconsistent approaches to the issue. In *Bradley v. Richmond School Board*, 416 U.S. 696, 715, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974), the Supreme Court determined that even without an expression of Congressional intent, courts should apply the law in effect at the time of decision unless retroactive application would result in manifest injustice. In *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), however, the Court stated that "[r]etroactivity is not favored in the law ... [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* 109 S.Ct. at 471. Most recently in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, —— U.S. ——, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court recognized the apparent tension between *Bradley* and *Bowen* but did not resolve it. *Id.* 110 S.Ct. at 1577.[2]

I do not find this unsettled area of the law of statutory retroactivity to be material here. It is apparent that the revision in the scope of § 1823(e) to encompass the FDIC as receiver did nothing but codify a common law development under *D'Oench*. *FDIC v. McClanahan*, 795 F.2d at 514 n. 1 (5th Cir.1986). "The mere fact that Congress codifies a [legal right] creates no presumption of the nonexistence of similar rights at common law...." *State Department of Fish and Game v. S.S. Bournemouth*, 307 F.Supp. 922, 929 (S.D.Cal.1969). Where, as here, the statutory provision

---

**1.** The oral agreement and the filing of this case occurred before FIRREA became effective on August 9, 1989. *Demars v. First Service Bank for Savings*, 907 F.2d 1237, 1239 (1st Cir.1990) ("because FIRREA is silent as to its effective date ... FIRREA became effective on the date of enactment").

**2.** I note that in *Demars v. First Service Bank for Savings*, supra, note 1, the First Circuit decided to apply a section of FIRREA other than that at issue here to a case pending on the date of FIRREA's enactment. The *Demars* court observed that the Supreme Court had announced a presumption that "statutes affecting substantive rights ... have only prospective effect." *Id.* at

1239 (quoting *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1984)). In his opinion for the court in *Demars*, Judge Campbell emphasized that "[s]ection 209 of FIRREA does not in any way alter substantive rules of conduct." *Id.* at 1240. The court concluded that private expectations were not disappointed and that, therefore, manifest injustice did not result. *Demars* suggests that under First Circuit case law the touchstone for deciding which presumption to apply, therefore, is whether retroactive application alters substantive rules of conduct and disappoints private expectations.

merely reaffirms preexisting law, there is no basis for concluding that Congress intended to displace or call into question developments under *D'Oench*. *See generally*, 2A Sutherland Stat.Const. § 50.05 (4th ed.). Rather, it appears that the recent revision to § 1823(e) was designed to secure these developments against the possibility of contrary common law case development.[3]

In short, the recent revision to § 1823(e) reinforces the determination that the *D'Oench* doctrine is applicable as a matter of federal common law to the issues here, despite the FDIC's appearance as a receiver in this proceeding.

### III

Plaintiffs suggest that the *D'Oench* doctrine does not apply to at least certain of its affirmative claims. In particular, plaintiffs contend that their tort claims against First Service should provide both a basis to recover and a defense against recovery from them by the FDIC. Under a faithful application of *D'Oench*, borrowers may not assert claims or affirmative defenses based on an oral agreement. *See, e.g., FSLIC v. Two Rivers Associates, Inc.*, 880 F.2d 1267, 1277 (11th Cir.1989); *First State Bank of Wayne County v. City and County Bank of Knox County*, 872 F.2d 707, 717 (6th Cir.1989); *Mainland Savings and Loan Association v. Riverfront Associates Inc.*, 872 F.2d 955, 956 (10th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989); *FirstSouth, F.A. v. Aqua Construction, Inc.*, 858 F.2d 441, 443 (8th Cir.1988); *FDIC v. Investors Associates X, Ltd.*, 775 F.2d 152, 154–55 (6th Cir.1985); *FDIC v. First National Finance Co.*, 587 F.2d 1009, 1012 (9th Cir. 1978). I conclude *D'Oench* stands as a bar even if the claims or defenses are styled as sounding in tort if those claims or defenses arise out of the purported oral agreement. *Beighley v. FDIC*, 868 F.2d 776, 784 & n. 12 (5th Cir.1989). *Cf. Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 402, 98 L.Ed.2d

340 (1987) (rejecting, under § 1823(e), fraud in the inducement defense asserted against FDIC). Because plaintiffs' affirmative tort theories, whether expressed as causes of action in their complaint or as affirmative defenses to the FDIC's counterclaim, all arise out of the purported oral agreement with First Service, the *D'Oench* estoppel doctrine bars them.

### IV

Having informed the parties at the hearing on the FDIC's various motions that my likely resolution of the case on the merits would result in summary judgment for the FDIC, I invited the FDIC to apply before judgment entered for the attorneys fees and costs of collection to which lender was entitled under the loan agreements. Timberland was afforded the opportunity to file an objection.

Timberland filed a brief objection to certain of the time claimed and to certain items of cost. I have conducted an independent review and while I will award the attorney's fees claimed, I will exclude certain of the costs.

I am satisfied that the case was properly and proportionately staffed by Ropes and Gray as counsel for the FDIC. The hourly rate negotiated between the firm and the FDIC, involving a discount from customary billing rates, appears fair and reasonable. I do not find the time spent to perform the necessary tasks in this litigation to have been excessive.

The costs claimed, however, raise certain problems. This is in part because law firms have begun claiming as separate expenses and disbursements certain costs that arguably should be incorporated in firm overhead for which the fee award itself is designed to compensate.

It has become customary among law firms to expense photocopying costs. The photocopying charges claimed here are, however, stated at 20 cents per page. This is excessive in light of the cost of this

**3.** *Cf. FDIC v. Dalba*, 1990 WL 43750, 1990 U.S. Dist. LEXIS 3502 (W.D.Wisc.1990). In *Dalba* the court conducted a limited retroactivity analysis of § 1823(e) and concluded that application to the FDIC as receiver would not create

manifest injustice. The Court explained that private expectations were not upset because the new "statute has little impact on the rights previously existing under the common law *D'Oench* doctrine." *Id.* at 10.

service outside the law firm. I will allow 10 cents per page for photocopying charges, thereby reducing this charge from $567.80 to $283.90.

Although there is a dispute in the case law regarding the recoverability of computerized legal research, I share the views expressed by Judge Selya, while sitting as a District Judge, that

> Lexis is an essential tool of a modern, efficient law office. As such, it saves lawyers' time by increasing the efficacy of legal research. Denial of reimbursement for Lexis charges in a proper case would be an open invitation to law firms to use high-priced attorney time to perform routine research tasks that can be accomplished quicker and more economically with Lexis.

*United Nuclear Corp. v. Cannon,* 564 F.Supp. 581, 591–92 (D.R.I.1983).

On its face, the $1,019.11 claimed appears reasonable in light of the need to provide the Court with the latest cases in this active area of the law.

The claimed automated document preparation fee, however, is plainly an overhead cost which should be absorbed in the fee award proper. The decisions a law office makes concerning the type of word processing equipment to use should not be shifted as a disbursement expense for those against whom fees are assessed by the court. Regular paying clients may be prepared to accept such costs as disbursements; but I, along with Judge Fuste, "seriously question the practice of directly charging clients for costs such as these." *Ramos Colon v. Secretary of Health and Human Services,* 666 F.Supp. 10, 12 (D.P.R.1987).

■ Costs imposed for automated document preparation should be distinguished "from the costs of on-line computerized legal research such as Westlaw or Lexis, where the attorney is billed an identifiable amount for a research service performed in a specific case, which is then passed on to the client; or for the cost of products such as photocopies." *Id.* at n. 2. Unlike photocopying services for which an ascertainable competitive market cost exists or computerized legal research provided by a subcontracting entity which independently bills a law firm according to a particular client matter, automated document preparation costs appear to be set by a law firm's speculation regarding how much of its equipment costs it can pass on to clients beyond the overhead included in hourly rates for its professionals. This is a cost which should be recovered as a component of the hourly rates of the firm so that comparison with market rates of other attorneys is meaningful.

Consequently, I will exclude the entire $671.75 in automated document preparation charges claimed.[4]

Certain unexplained travel costs, including taxi service apparently independent of courier and delivery costs, are claimed. Except for Mr. Stillman's required presence at a conference in Worcester on April 17, I am aware of no event which necessitated travel in this case. I assume that apart from Mr. Stillman's Worcester travel, these charges are the costs of sending personnel home after hours; as such they are costs which should be absorbed as overhead. Nothing in the litigation of this case involved the necessity for overtime or late hours work. To the degree that the firm chose to allocate such work to this case, the consequences in terms of travel charges may not be shifted to the plaintiffs as reasonable costs of collection. As to what I assume was Mr. Stillman's Worcester travel (which is unaccountably recorded incorrectly as 4/19/90 rather than 4/17/90), I will limit reimbursement to that which was provided to the court staff from Boston required to attend the April 17 session in Worcester. The travel charges will thus be reduced from $166.00 to $35.45.

In all other respects I find the costs claimed to be fair and reasonable.

The clerk will consequently be directed to assess attorney's fees in the amount of

---

**4.** For the same reason, I will exclude the $68.50 charged for "Tabs & Bindings." Whether office supply purchases unusual in quantity or item may be charged as costs in certain cases is an issue I do not reach. Here the tabs and bindings are ordinary office supplies which belong in overhead reflected as fees and not as disbursements.

$26,778.39 and costs in the amount of $1,646.37 for a total of $28,424.76.

## V

Accordingly, for the reasons more fully stated above, I hereby:

1) ALLOW the "FDIC's Motion for Summary Judgment" (dismissing all claims in the plaintiffs' complaint);

2) ALLOW the FDIC's "Motion to Strike Defenses Pursuant to Rule 12(f)";

3) ALLOW the "FDIC's Motion for Summary Judgment on Counterclaims";

4) ORDER the clerk to enter judgment for the defendant in the amount of $5,696,-904.69 together with reasonable attorney's fees and costs in the amount of $28,424.76.