**RESOLUTION TRUST CORPORATION in its capacity as receiver for Bell Federal Savings Bank**

v.

**John L. DADDONA, Sr., Judy Daddona and Daniel Culnen, Appellants.**

No. 93–1195.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit LAR 34.1(a) Aug. 26, 1993.

Decided Nov. 16, 1993.

**314**

James M. Barker, Asst. Gen. Counsel, Michael P. Condon, Sr. Counsel, Sheila Kraft Budoff, Counsel, Resolution Trust Corp., Washington, DC, James S. Crockett, Jr., Panos S. Midis, Mays & Valentine, Richmond, VA, Michael R. Lastowski, Saul, Ewing, Remick & Saul, Philadelphia, PA for appellee.

Mitchell R. Leiderman, Media, PA, for appellants.

Before: BECKER, NYGAARD, and ALITO, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by several real estate developers who are in default of their loan obligations to a failed savings and loan and who were unsuccessful in the district court in asserting a lender liability claim (based on the alleged failure of the thrift to supply additional financing) as a defense to the claim for the balance due brought by the thrift's successor in interest, the Resolution Trust Corporation ("RTC"). RTC prevailed on the basis that the alleged agreement to supply additional funds was not in writing as is necessary to meet the requirements of the common law *D'Oench, Duhme* doctrine and the statutory mandate of 12 U.S.C. § 1823(e). *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

We hold that an agreement is only "in writing" if its basic structure is apparent on the face of the writing. Because no terms of Bell's alleged agreement to lend CUL–DADD Development Corp., Inc. ("CUL–DADD") additional funds are written, we will affirm the district court's grant of summary judgment for the RTC. In so doing we reject defendants' constitutional claims that *D'Oench, Duhme* and § 1823(e) constitute takings of property without just compensation and deprivations of property without due process.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background Facts*

RTC is the receiver for Bell Federal Savings Bank, which is the successor to Bell Savings Bank ("Bell Savings") which, on June 29, 1989, agreed to lend CUL–DADD Development Corp., Inc. $2,230,000. CUL–DADD secured the loan by executing and delivering two mortgages on CUL–DADD Industrial Park to Bell Savings.[1] Defendants John L. Daddona, Judy Daddona and Daniel Culnen are sureties on this loan, and RTC brought this action to collect on their guarantees.

Defendants assert that when Bell agreed to provide the June 29 loan for the acquisition of property, Bell also agreed to provide CUL–DADD with at least an additional $9,000,000 for improvement and development of CUL–DADD Industrial Park in Weisenburg Township, Pennsylvania and for 75 acres in the Borough of Kutztown, Pennsylvania. Bell, it is alleged, was to provide this financing within 90 to 120 days of the June 29 loan at an interest rate of prime plus two points for a minimum of one year.

Defendants contend that from June until December 1989, CUL–DADD repeatedly requested that Bell close the loans for development of the site but that Bell refused to do so, and in December made it clear that it was never going to close on the loans. Defen-

---

**1.** The Director of the Office of Thrift Supervision ("OTS") appointed RTC as conservator on March 15, 1991, after finding that Bell Savings was likely to incur losses as a result of unsafe and unsound practices. The conservatorship was replaced with a receivership on March 19, 1991 when OTS closed Bell Savings. OTS then formed Bell Federal as a chartered federal savings association with some of the assets and liabilities of Bell Savings, including the Note and loan documents involved in this case. On March 20, 1992, OTS shut down Bell Federal and appointed RTC as its receiver. RTC thus became the holder of the Note and loan documents at issue. RTC is the successor to all rights, title and interest in the note pursuant to 12 U.S.C. § 1821(d)(2), which applies to the RTC by virtue of 12 U.S.C. § 1441(a)(b)(4).

dants claim that, in the interim, CUL–DADD expended funds in reliance on Bell's promise of additional loans.

### B. *Procedural History*

On December 18, 1990, Bell Savings filed two separate actions in the Court of Common Pleas of Delaware County, Pennsylvania, to recover from defendants on the $2,230,000 initial loan. One action was filed against John Daddona, Sr. and Judy Daddona, and the other action was filed against Daniel Culnen. The court entered two confessed judgments and then opened the judgments to allow the sureties to file counterclaims. Subsequently, the RTC succeeded to the rights of Bell Savings, see *supra* n. 1, and removed the two actions to the District Court for the Eastern District of Pennsylvania. Defendants then filed counterclaims, asserting that they were entitled to $1,000,000 plus costs and punitive damages due to Bell's default on the alleged agreement to provide additional loans.

The RTC moved to dismiss the counterclaims under the *D'Oench, Duhme* doctrine, see *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its codified counterpart, *see* 12 U.S.C. § 1823(e), which require that claims against the RTC be based on *written* agreements. Defendants responded that their claim arose from a written agreement composed of an integration of a series of writings. They cited a variety of writings which we will discuss in detail below. Moreover, they asserted that § 1823(e) and the *D'Oench, Duhme* doctrine violated their rights under the Fifth Amendment's prohibition on taking of property without just compensation and its mandate of procedural and substantive due process.

At the same time it filed its action against defendants in the Court of Common Pleas, Bell also filed an action against CUL–DADD to collect on the same $2,230,000 loan. As in the actions against the sureties, the court entered a confessed judgment and then allowed CUL–DADD to bring a counterclaim. On November 9, after RTC removed the action to federal court, the district court granted summary judgment against CUL–DADD finding that:

> Viewed in a light most favorable to CUL–DADD, the semantic differences in the documents suggest that the parties contemplated and considered additional financing. Nevertheless, this falls far short of the certain and categorical requirements imposed by the *D'Oench, Duhme* doctrine and § 1823(e). *See [Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987)]. A careful review of the documents reveals that the only monetary figure that parties reduced to writing is the $2,230,000.00 commitment. Neither the $9,000,000.00 figure nor any other additional terms are represented in CUL–DADD's exhibits.

CUL–DADD appealed, and we dismissed the appeal for lack of jurisdiction under *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam). *See Bell Savings Bank v. CUL–DADD*, 6 F.3d 778 (1993).

On December 11, 1992, the district court combined the two separate actions against the sureties and converted RTC's motions to dismiss into one motion for summary judgment. On January 28, 1993, the district court granted RTC's motion for summary judgment, adopting its holding from the action against CUL–DADD that no written agreement for additional loans had been formed. The court also rejected defendants' constitutional claims. This appeal followed.

 We exercise plenary review over motions for summary judgment to determine whether the moving party has demonstrated the absence of a genuine issue of material fact. *See Colburn v. Upper Darby Township*, 946 F.2d 1017, 1020 (3d Cir.1991). We consider inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). Defendants contend that there is a genuine issue of material fact as to whether Bell Savings entered into a written agreement with CUL–DADD for loans beyond the $2,230,000—a written agreement sufficient to meet the requirements of *D'Oench, Duhme* and § 1823(e).

## II. WRITTEN AGREEMENTS UNDER *D'OENCH, DUHME* AND § 1823(e)

### A. *Background of* D'Oench, Duhme *and § 1823(e)*

In *D'Oench, Duhme,* the Supreme Court developed a federal common law rule designed to protect federal institutions from misrepresentations in bank records. *See* 315 U.S. at 459, 62 S.Ct. at 680. The Court held that the Federal Deposit Insurance Corporation ("FDIC") could collect on notes it had acquired from a bank even though the debtor who had executed the notes had a written side agreement with the bank that he would not have to pay on the notes. *See id.* at 454, 461–62, 62 S.Ct. at 678, 681. The Court explained that it would have been difficult for the FDIC to discover the side agreement when it acquired the note from the bank because no copy was in the bank records. Because the side agreement was deceptive, the Court allowed the FDIC to collect on the note despite the side agreement. *See id.* at 460, 62 S.Ct. at 681. This Court summarized the general meaning of *D'Oench, Duhme* in *Adams v. Madison Realty & Dev., Inc.,* 937 F.2d 845, 852 (3d Cir.1991), and extended it to the RTC:

> The rule emerging from *D'Oench, Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC.... Given the general applicability of policies underlying the *D'Oench, Duhme* doctrine we find that the doctrine is also applicable to the RTC.

The Federal Deposit Insurance Act of 1950 essentially codified the result in *D'Oench. See Adams,* 937 F.2d at 852. The Act provides that:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, con-

temporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). By enacting this provision, Congress opted for a "categorical recording scheme." *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987). "[T]he short of the matter is that Congress opted for the certainty of the requirements of section 1823(e). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew." *Id.*

### B. *Defendants' Claimed Written Agreement*

■ Defendants contend that their "agreement" with CUL–DADD for loans beyond the initial $2,230,000 survives the requirements of *D'Oench, Duhme* and § 1823(e). They point to several writings that refer to the $2,230,000 loan as an *initial* loan and refer to purposes other than the acquisition of property; they then submit that these imply the existence of an agreement for additional loans for development. In particular, defendants cite: (1) a June 26, 1989 letter from John Daddona to Scott Plavner, Assistant Vice President of Bell, confirming the agreement for a full "package of financing"; (2) a June 22, 1989 letter from Plavner referring to an "*initial* advance of up to $2,230,-000" (emphasis added) and committing Bell Savings to finance the "acquisition *and development* and soft costs of the project" (emphasis added); (3) appraisals of the property as a *completed* industrial park (made at Bell Savings' request); (4) a letter from CUL–DADD to Bell with the caption "Re: *Construction* Loan" (emphasis added); (5) the "Collateral Assignment of Agreements" dated June 29, 1989, which states that "Bell [Savings] is the lender of funds to CDC for acquisition *and development* of an industrial park" (emphasis added); (6) the document

entitled "Funding for Closing" which refers to the loan as for "Acquisition/*Development*" (emphasis added); and (7) the Loan Committee Meetings Minutes from May 31, June 20 and June 27, 1989, which all refer to the $2,230,000 loan as an "*interim* mortgage loan" (A–132, 137) (emphasis added).

In our view, however, the writings that defendants point to as evidence of the existence of an "agreement ... in writing," § 1823(e), do not create a genuine issue of material fact as to the existence of such a written agreement. The letter from John Daddona was not signed by CUL–DADD and does not indicate that the full "package of financing" was to go beyond the $2,230,000. The June 22 letter from Plavner referring to an "initial advance of up to $2,230,000" implies no more than that CUL–DADD could have as much of the $2,230,000 as it wanted in an initial advance, with later advances to follow until the $2,230,000 total had been advanced. Moreover, even if the letter indicates that Bell Savings thought of the *whole* $2,230,000 as an initial advance with later advances to follow, it does not reflect that Bell actually had already agreed to later advances but only that Bell contemplated such advances. The same is true of the Loan Committee's references to the $2,230,000 loan as an interim loan.

Finally, the documents referring to the "Acquisition/Development" loan or "Construction Loan" are all documents discussing the $2,230,000 loan; the parties may have considered *this* loan to be an acquisition and development loan rather than considering it to be an acquisition loan with development loans to follow. But even if the parties contemplated later development loans, the reference to these loans does not indicate that the parties had already agreed to such loans.

Thus, giving defendants the benefit of every inference, the evidence establishes no more than that the parties contemplated future loans, not that they had agreed to them.[2] Even stretching the evidence beyond where it can reasonably be taken, the evidence at most indicates that the parties had already formed an oral agreement for future loans.[3] The writings themselves certainly do not constitute such an agreement, for they provide *no* terms of the alleged agreement whatsoever.[4]

### C. *Applicability of Federal Law*

■ Perhaps anticipating the foregoing conclusion, defendants contend that *D'Oench, Duhme* and § 1823(e) do not require that the terms of an agreement be in writing but only that the existence of an agreement can be inferred from writings. They cite Pennsylvania contract cases for the proposition that

**2.** Similarly, in *Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241 (9th Cir. 1990), the Ninth Circuit applied § 1823(e) to bar a defense based on a written letter promising a certain loan that was unsigned and that appeared to have been superseded by a later, signed letter promising a lesser loan. The court explained, "There is no explicit statement in Gemini's loan file ... of any obligation beyond the fully documented loan of $1.1 million. Centennial's 'intent' to loan the additional $445,000 falls short of establishing that Centennial was *obligated* to fund the entire project." *Id.* at 245.

**3.** Defendants suggest that they might have been able to provide more specific writings if plaintiffs had given them unredacted copies of the minutes of the bank's Board of Director Meetings. However, Joanne Klutz, an investigator for the RTC, stated in her affidavit that no redacted material in the redacted minutes given to defendants related to CUL–DADD. Furthermore, defendants have provided us with no reason to expect that a more concrete agreement lies hidden in the RTC's files. Given that we review district court decisions regarding discovery only for abuse of

discretion, *see Public Loan Co. v. Federal Deposit Ins. Corp.*, 803 F.2d 82 (3rd Cir.1986); *Marroquin–Manriquez v. Immigration & Naturalization Serv.*, 699 F.2d 129, 134 (3d Cir.1983), defendants' argument that we should overturn the district court's summary judgment decision in order to allow additional discovery cannot succeed.

**4.** In addition to failing to constitute an "agreement ... in writing," the agreement asserted by defendants fails to meet § 1823(e)'s requirement that the agreement be approved by the "board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee." 12 U.S.C. § 1823(e). The only writings defendants point to which were approved by the bank's board or loan committee are the Loan Committee Meeting Minutes referring to the loan as an "interim mortgage loan." These writings by themselves do not reflect approval of an agreement for a loan beyond the initial $2,230,000.00.

a contract can be formed even if not all of the specific terms have been agreed upon. Even if this is so, defendants do not explain why Pennsylvania law rather than federal common law should apply.

Defendants cite only one case that implies that we should look to state contract law. In *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635, 637 (D.N.J.1990), plaintiffs initiated a lender liability action against a bank which was under the receivership of the FDIC. Plaintiffs alleged that the bank had agreed to fund the costs for land acquisition, development and construction of a residential condominium. Defendants' initial loan was only sufficient to fund the first portion of the project. *See id.* at 638. The court allowed additional discovery so that plaintiffs could attempt to find written evidence of the agreement to provide additional loans sufficient to meet the requirements of § 1823(e). *See id.* at 643. The court cautioned, however, that these requirements were stringent and that plaintiffs would have to provide documents sufficient under "New Jersey law, [to] rise to the level of an enforceable contract and which satisf[y] the remaining requirements of section 1823(e) and *D'Oench, Duhme.*" *Id.* at 644. Thus, the *Tuxedo Beach Club* court indicated that meeting the requirements of New Jersey law for contract formation was necessary to survive § 1823(e) and *D'Oench, Duhme;* it did not, however, clearly determine that meeting New Jersey law was sufficient. Moreover, the court declined to decide whether New Jersey law allows a contract to be formed by integrating several separate written documents and whether, even if an agreement can be formed by an integration of documents, an "integration" agreement is a *written* agreement or merely an oral agreement *evidenced* by writings. *Id.* at 644 n. 5. Hence, the one case defendants cite that discusses *D'Oench, Duhme* did not decide the issue necessary for defendants to prevail.

*D'Oench, Duhme* is itself a case based solely on federal common law, *see* 315 U.S. at 455–59, 62 S.Ct. at 678–80, and the same considerations that justified application of federal common law in *D'Oench, Duhme* justify application of federal law here. This is especially true given that the terms "agreement ... in writing," which we are interpreting, are part of a federal statute. In *Federal Deposit Ins. Corp. v. Blue Rock Shopping Center, Inc.*, 766 F.2d 744, 747 (3d Cir.1985), this Court concluded that federal law should govern disputes involving the FDIC. And in *Adams, supra* p. 316, we explained that the same is true for disputes involving the RTC: "recent precedent confirms that we should apply federal common law to determine the rights and interests of parties to negotiable interests where the FDIC or RTC is a party." 937 F.2d at 855 (3d Cir.1991) (citations omitted).

In large part, *Adams'* conclusion that federal law governs application of *D'Oench, Duhme* rests on an application of the three-factor test of *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979) (applying a three-part test to determine that state law should govern the question of which of two lenders has priority to particular collateral even though one lender's loan was backed by a guarantee from the federal government under the Small Business Act). *See* 937 F.2d at 856. In contrast to *Kimbell* itself, application of its test here compels the conclusion that federal law prevails.

First, the federal program at issue in § 1823(e) requires national uniformity. The interest Congress professed through § 1823(e) "in protecting federal banking agencies from secret agreements" would be undermined if those interests "hinge[d] on the peculiarities of state law." *Id.* Second, state law would frustrate specific objectives of the federal program. Here, application of state law that forced the RTC to check bank records extremely carefully would undermine Congress' objective of ensuring that RTC officials could easily understand those records. Third, the application of federal law would not disrupt commercial relationships predicated on state law. Borrowers can easily take into account the requirements of § 1823(e). Unlike the lenders in *Kimbell Foods*, who would have had to take into account competing schemes of federal and state law on priorities in collateral if federal law applied, *see* 440 U.S. at 739–40, 99 S.Ct.

at 1464, the borrowers here will only have to consider the meaning federal law gives to "agreement ... in writing."

Finally, we note that so far the Supreme Court has relied exclusively on federal law to interpret the requirements of § 1823(e). In *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987), the Supreme Court held that § 1823(e) barred defendants from asserting that the Planter's Trust & Savings Bank had fraudulently induced them to enter an agreement by misrepresenting the amount and nature of land they were purchasing. The Court looked to federal common law to define "agreement" and determined that promises are part of an agreement and so have to be written in order to survive § 1823(e). *See id.* at 91, 108 S.Ct. at 401. Similarly, we hold that federal common law should govern the meaning of "agreement ... in writing" under § 1823(e) and *D'Oench, Duhme*.

### D. *Requirements of Federal Law*

In order to determine the meaning of "agreement ... in writing" under federal law, we look to the purposes of § 1823(e). In *Langley,* the Court indicated that the purpose of § 1823(e) is to enable the FDIC to evaluate bank assets and to do so quickly. *See Langley,* 484 U.S. at 91, 108 S.Ct. at 401. Judge Goldberg, writing for the Fifth Circuit, has aptly explained this goal:

> Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities.

*Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1016 (5th Cir.1990).

In order to ensure that RTC spreadsheet experts have no need to perform a Lewis Carroll-like search, we hold that under federal law, an agreement is only *in writing* if the basic *structure* of the agreement is apparent on the face of writings. In reaching this holding, we only slightly extend our conclusion in *Adams,* 937 F.2d at 852, where we explained that "[t]he rule emerging from *D'Oench, Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC." Here we add that, not only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement—its essential terms—must also appear plainly on the face of that obligation.

Other courts of appeals to consider the issue have come to a similar conclusion. In *Federal Sav. & Loan Ins. Corp. v. Two Rivers Assocs., Inc.,* 880 F.2d 1267 (11th Cir. 1989), Two Rivers' defense relied on a promise by Sunrise Savings and Loan Association to loan additional funds beyond the initial $2.5 million. The Eleventh Circuit held that an express written agreement to provide an additional "Construction Loan" might have been a sufficient defense in an ordinary contract suit but was an insufficient defense when *D'Oench, Duhme* applied. The alleged loan agreement was insufficient because it did not enumerate the terms of the loan. *See id.* at 1275–76.

Similarly, in *Federal Deposit Ins. Corp. v. O'Neil,* 809 F.2d 350 (7th Cir.1987), the Seventh Circuit required the terms of an agreement to be evident on the face of a writing in order to meet the requirements of § 1823(e). In *O'Neil,* defendant's loan agreement with the Continental Illinois National Bank conditioned defendant's obligations on the bank's compliance with "that certain agreement." The Seventh Circuit, however, refused to allow the defendant to rely on the bank's alleged breach of "that certain agreement" to avoid repayment of the loan. It explained:

> The statute contemplates, however, that the FDIC's appraisers can confine their scrutiny to documents found in the bank's official records. The certain agreement was not among them. If we accepted Joyce's argument this would imply that when the appraiser came across the promissory note he would have had to conduct

an inquiry into the whereabouts, status, and terms of the 'certain agreement,' mentioned in (but not a part of) the note. . . . The FDIC is not required to go so far. *Id.* at 353. Thus, even though the FDIC knew of the existence of a side agreement from the face of a writing, this side agreement could not serve as a defense because its terms were not set out in that writing.

The Fifth Circuit summarized this general conclusion of the courts of appeals in *Federal Deposit Ins. Corp. v. Hamilton,* 939 F.2d 1225, 1226 (5th Cir.1991). In ruling that *D'Oench, Duhme* and § 1823(e) barred defendants' reliance on local customs to flesh out the terms of their agreement with a bank as well as their attempt to imply terms from the bank's records, the court explained:

> [W]e believe that section 1823(e)'s use of the term 'in writing' cannot include the writing's implied terms. . . . [T]he term 'in writing' for section 1823 purposes, has been narrowly construed so as to incorporate only those obligations expressed on the face of the subject writing.

*Id.* at 1231. Here, the writings presented by defendants provide *no* terms of an additional agreement between Bell Savings Bank and CUL–DADD, much less terms sufficient to constitute the basic structure of the agreement. Thus, defendants' reliance on this supposed agreement is barred by *D'Oench, Duhme* and § 1823(e).[5]

## III. CONSTITUTIONAL ISSUES

### A. *Taking of Property Without Just Compensation*

■ Defendants also assert that *D'Oench, Duhme* and § 1823(e) are unconstitutional.

They first assert that these doctrines take property from them without providing just compensation. In defendant's submission, the property "taken" consists of the land defendants will lose as a result of not having these defenses. Defendants rely on *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986), in which the Supreme Court held that takings analysis cannot be reduced to a set formula but that three factors are particularly important: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. Evaluating these factors, defendants argue that *D'Oench, Duhme* and § 1823(e) completely deprive them of their property, interfere with their investment backed expectations which could not reasonably be expected to take into account the possibility of bank failure and takeover by the RTC, and are not justified as necessary to serve the public good.

In fact, application of the *Connolly* factors shows the weakness of defendants' claim. First, § 1823(e) does not automatically deprive mortgagors of all economic value in their mortgaged property; it only poses a risk of doing so. Section 1823(e) deprives mortgagors of that value only if they make unwritten agreements that would serve as a defense to a foreclosure claim absent § 1823(e) *and* if the RTC acquires the interest of the original mortgagee. Second, § 1823(e) and *D'Oench, Duhme* do not interfere with reasonable investment-backed ex-

---

5. Even if we were to apply Pennsylvania contract law, the result would be the same. Under Pennsylvania contract law, "[t]o satisfy the statute of frauds, a memorandum of a contract must show all the essential terms and conditions of the contract with reasonable certainty." 16 P.L.E., Statute of Frauds § 54 (citations omitted). For example, in *Pierro v. Pierro,* 438 Pa. 119, 264 A.2d 692, 695 (1970), the court held that for purposes of the Statute of Frauds, parol evidence cannot be used to create a description of land referred to in a writing. Indeed, the Pennsylvania Supreme Court has extended its requirement for definite terms beyond the context of the Statute of Frauds. In considering whether writings are sufficient to constitute a "written agreement for

an extension of time" as required by Pa.R.C.P. 237.1, that court has held that, "[t]he requirements, basically, are the same as for any writing which purports to be a contract: the parties must be known; the terms . . . must be definite; and the writing must, when plainly construed, indicate an agreement or meeting of the minds on the terms." *Johnson v. Southeastern Pa. Transp. Auth.,* 524 Pa. 209, 570 A.2d 71, 73 (1990). Defendants have not presented a writing which, "when plainly construed, indicate[s] an agreement or meeting of the minds on the terms," and thus under Pennsylvania law have not produced sufficient evidence of a written agreement for loans beyond the initial $2,230,000.

pectations, because, in a day of a significant number of bank failures and RTC takeovers, prudent investors are aware of the risks these doctrines pose when they arrange for loans. Moreover, prudent investors will simply make sure that all of their agreements with banks are reduced to writing. Even more than in *Connolly*, where the Court indicated that prudent employers should have taken the possibility of *future* regulations into account based on the number of past regulations in the field, *see* 475 U.S. at 227, 106 S.Ct. at 1027, CUL–DADD should have taken into account the effects of § 1823(e) and *D'Oench, Duhme*. These doctrines were already in effect when CUL–DADD made its alleged agreements.

Third, the government was regulating for the common good. As the Eighth Circuit explained, "[t]he FDIC is acting in its receivership, not its corporate capacity, and therefore the effect of denying the priority will generally issue to the benefit of [the failed institution's] depositors and creditors rather than the government." *North Arkansas Medical Ctr. v. Barrett*, 962 F.2d 780, 790 (8th Cir.1992). Thus, application of the three *Connolly* factors demonstrates that neither *D'Oench, Duhme* nor § 1823(e) take property within the meaning of the Fifth Amendment. A similar conclusion has been reached by other courts of appeals. *See, e.g., id.* at 790; *Federal Sav. & Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 699 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992).

B. *Deprivation of Property Without Due Process*

■ Finally, defendants contend that § 1823(e) and *D'Oench, Duhme* violate procedural due process by depriving them of the opportunity to present all of their defenses, specifically the chance to present the defense that Bell Savings breached its agreement. But defendants do not face a procedural bar that prevents them from presenting this defense; rather they face a substantive law that eliminates the defense when it relies on an agreement that is not in writing. It is surely not a deprivation of due process every time the courts or legislature eliminate or

limit a substantive defense that formerly existed. *See Chatham Ventures, Inc. v. Federal Deposit Ins. Corp.*, 651 F.2d 355 (5th Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).

Furthermore, when CUL–DADD entered its agreement, it knew that if Bell Savings failed and the RTC became its receiver, only written agreements would serve as a defense to claims by the RTC. As the Fifth Circuit explained in *Campbell Leasing, Inc. v. Federal Deposit Ins. Corp.*, 901 F.2d 1244 (5th Cir.1990), "[t]he *D'Oench, Duhme* doctrine is a federal common law rule of general applicability that was established long before the appellants' claims arose. Because the appellants had 'a reasonable opportunity both to familiarize themselves with [its] general requirements and to comply with those requirements,' due process has been satisfied." *Id.* at 1248 (quoting *United States v. Locke*, 471 U.S. 84, 108, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985)).

The judgment of the district court will be affirmed.