BEAL BANK, SSB, Plaintiff,

v.

William A. LUCKS, Amanda Lucks, Ronald L. Stephens, Ellen P. Stephens, and the Inn at Canal Square Company, L.P., Defendants.

C.A. No. 14896.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 30, 2000.
Decided: Sept. 14, 2000.

Cathy L. Reese, Esquire, Blank Rome Comisky & McCaulley, LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Jeffrey L. Clark, Esquire, Schmittinger & Rodriguez, Dover, Delaware, Attorneys for Defendants.

William A. Lucks, Pro Se.

Amanda Lucks, Pro Se.

## OPINION

LAMB, Vice Chancellor.

### I. Introduction

Before me are cross-motions for summary judgment on claims arising out of two promissory notes. Plaintiff Beal Bank's predecessor-in-interest, Second National Federal Savings Bank (SNFSB), exchanged the first of the two notes in 1985 ("1985 Note") for a loan of $410,000 to defendants William and Amanda Lucks secured by a mortgage on property known as the Canal Square Property. Following a default on the 1985 Note, SNFSB and the Luckses entered into a settlement agreement in 1993 ("1993 Settlement Agreement"), which was approved by a judge overseeing the Luckses' personal bankruptcy. The Luckses later defaulted on the 1993 Settlement Agreement, and Beal has sued both for specific performance of certain obligations under that agreement and for damages for its breach. Beal now moves for entry of judgment by

default and summary judgment on its claims against the Luckses.

SNFSB exchanged the second note in 1987 ("1987 Note") for a loan of $1,400,000 to defendant The Inn at Canal Square Limited Partnership ("Inn Partnership") secured by a Guaranty and a Mortgage on property known as The Inn Property. Defendants Ronald L. Stephens and Ellen P. Stephens, husband and wife, signed the 1987 Note. Mr. Stephens signed both in his capacity as a general partner of the Inn Partnership and individually. Mrs. Stephens signed that note individually. They were also both parties to and signed the Guaranty. In 1991, after default, SNFSB brought suit against the Inn Partnership on the 1987 Note and the related Mortgage and obtained a stipulation of judgment that was entered by the Delaware Superior Court. This judgment incorporates the terms of a settlement agreement ("1991 Settlement Agreement") that substantially varied the obligations of the partnership under the 1987 Note. The 1991 Settlement Agreement also contains a form of general release of the parties (i.e., SNFSB and the Inn Partnership) "and their agents" for all "actions and representations ... occurring to the date of this Agreement."

In its Second Amended Complaint, dated March 6, 1998, Beal asserted two claims against Mr. and Mrs. Stephens and the Inn Partnership: Count IV (against the Stephenses for breach of the Guaranty), and Count V (against Ronald Stephens and the Inn Partnership for breach of the 1987 Note). On July 20, 2000, the parties filed a stipulation dismissing Count IV with prejudice. That stipulation was "so ordered" by the court on July 21, 2000. Beal then moved to amend its complaint to add Mrs. Stephens as a defendant on Count V. That motion was granted by order dated September 12, 2000. Plaintiff sought leave to amend its complaint on September 12,

2000 to include claims against the Inn Partnership and Ronald Stephens under the 1991 Settlement Agreement, and defendants Stephens and the Inn Partnership have stated that they will oppose such a motion.

Presently, however, cross-motions for summary judgment as to Count V have been filed by Beal, the Inn Partnership, and the Stephenses, presenting two questions. First, are the Stephenses individually liable as makers of the 1987 Note, or were they individually liable on that instrument only in their capacity as guarantors? Second, in light of the 1991 Settlement Agreement and the stipulated judgment, can Beal sue the Inn Partnership on the 1987 Note?

For the reasons that follow, I conclude that summary judgment must be entered in favor of the Inn Partnership and the Stephenses as to Count V of the Second Amended Complaint.

## II. Factual Background

Plaintiff Beal Bank filed its complaint in this court on March 15, 1996, requesting specific performance of a 1993 Settlement Agreement against the Luckses. Beal later amended its complaint to add Ronald and Ellen Stephens (husband and wife), the Inn Partnership, and the Hirsch Cummings Group as defendants. Additionally, Beal added allegations of fact regarding the 1987 Note, Guaranty, and a related 1991 Settlement Agreement, as well as claims regarding conveyances made by the Luckses in 1995. For the sake of clarity, I will discuss the 1985 Note and 1987 Note separately.

### A. The 1985 Note

Defendants William and Amanda Lucks executed the 1985 Note to SNFSB on October 25, 1985 in the amount of $410,000. The Luckses defaulted on this note and filed a voluntary petition for relief under federal bankruptcy law on July 18, 1991.

Before a settlement between the Luckses and SNFSB could be reached, SNFSB became insolvent in December 1992, and the Office of Thrift Supervision appointed the Resolution Trust Corporation (RTC) as conservator of SNFSB. As successor to SNFSB's interest in the Luckses' 1985 Note, the RTC entered into a settlement agreement with the Luckses on the 1985 Note on March 17, 1993, with the approval of the Bankruptcy Court. Thereafter, the RTC transferred all of its rights under the 1985 Note first to Bank of America National Trust and Savings Association (on March 1, 1994), next to Beal Mortgage, Inc. (on October 11, 1994), and finally to plaintiff Beal[1] (on March 30, 1995).

The 1993 Settlement Agreement required that the Luckses do the following, *inter alia:*

1. Repay the RTC subject to the schedule provided in the agreement (paragraph 2);

2. Execute a second lien on the "boathouse" (a houseboat known as "Legend of Lewes") (paragraph 4(b));

3. Execute an assignment of all remaining development rights within the Canal Square Condominium (paragraph 4(c));

4. Execute documents granting RTC the right to realize a security interest in the accounts receivable and inventories in the "Sugar and Spice" shop (paragraph 4(d));

5. Re-survey the Canal Square Condominium and to execute and record documents needed to amend the condominium declaration to reflect the actual location of the Canal Square condominium and extent of the mortgaged property (paragraph 7).

After the 1993 Settlement Agreement was reached, the Luckses failed to make any of the payments due or perform any of the obligations under the agreement. Rather, the Luckses transferred much of the Canal Square Property on November 6, 1995 to former-defendants Cambridge and Equity. All told, the balance of the loan due up to June 30, 2000 according to Beal was $578,588.93, plus interest after June 30, 2000, attorney's fees, and costs. The Luckses participated in the present litigation only fitfully, answering the initial complaint and providing some discovery. However, they are in default of many other requests for discovery and have not responded to the pending motions. Beal Bank initially moved for entry of a default judgment against the Luckses and also for summary judgment ordering specific performance of as well as amounts due under the 1993 Settlement Agreement by them. Beal has now amended its summary judgment motion and is only seeking amounts due under the 1993 Settlement Agreement.

## B. The 1987 Note

SNFSB exchanged the 1987 Note for a loan of $1,400,000 to the Inn Partnership on July 1, 1987, secured by a mortgage and security agreement. The Inn Partnership is a limited partnership formed by Ronald Stephens and William Lucks as general partners. Ronald Stephens and William Lucks signed the 1987 Note twice: first as partners of the "Borrower," then as individuals. Ellen Stephens and Amanda Lucks signed the 1987 Note as individuals. Additionally, the four individually executed the Guaranty that provided:

This Guaranty shall be the absolute and continuing obligation of Guarantors until the entire indebtedness advanced by Lender to Borrower, together with interest and other charges and expenses shall have been paid in full, at which time this Guaranty shall terminate and

---

**1.** Formerly known as Beal Banc, S.A., now known as Beal Bank, SSB.

shall have no force and effect; *or*, until public sewer has been approved and available to the property known as Front and Market St., Canal Square, Lewes, Lewes & Rehoboth Hundred, Sussex County, DE, *whichever comes first.*[2]

(emphasis added.) The Guaranty was explicitly incorporated into and made part of the 1987 Note.

The Inn Partnership defaulted on the 1987 Note, and in 1991 SNFSB initiated foreclosure proceedings in the Delaware Superior Court. The Inn Partnership was the sole defendant in that action.[3] The Superior Court entered a Stipulation of Judgment on July 19, 1991, providing that "[e]xecution on said Judgment may only proceed pursuant to the terms of a certain Settlement Agreement [the 1991 Settlement Agreement] entered into between the Plaintiff and the Defendant dated May 31, 1991, the terms of which are incorporated herein by reference thereto."[4] The 1991 Settlement Agreement, among other things, replaced the payment terms of the 1987 Note with a new schedule calling for a series of interest-related payments through December 31, 1995 and a balloon payment of the overdue principal and interest on that date.[5] The Inn Partnership performed under the 1991 Settlement Agreement for a period of time, but later defaulted.

Beal Bank succeeded to SNFSB's interest under the 1987 Note as then governed by the 1991 Settlement Agreement after SNFSB's 1992 insolvency. Beal sent notice of default to the Stephenses, the Luckses, and the Inn Partnership. The Inn Partnership initially responded by filing a petition under Chapter 11 of the Bankruptcy Code, but later withdrew it. The Inn Partnership, William Lucks, and Ronald Stephens then conveyed the Inn Property to Guardian Realty[6] for $1. Finally, Beal acted on its rights under the 1991 Settlement Agreement and foreclosed on the Inn Property which was sold for the sum of $950,000. Beal now claims that after crediting all amounts paid under the 1987 Note (with deductions for attorney's fees, expenses, and other amounts), the deficiency balance due is $1,249,268, plus interest after June 30, 2000, attorney's fees and costs.

Beal moves for summary judgment on its claim under the 1987 Note against the Inn Partnership, Ronald Stephens as general partner of the Inn Partnership, and Ronald Stephens and Ellen Stephens as individuals. The Luckses were discharged from liability under the 1987 Note by order of the Bankruptcy Court.

### III. Analysis

### A. It is Appropriate to Enter Judgment Against the Luckses on the 1993 Settlement Agreement and the 1985 Note.

Court of Chancery Rule 55(b) provides that "[w]hen a party against whom a judg-

---

2. Defs.' Op. Br. at App. at D–84 (Guaranty Agreement), at ¶ 7.

3. *Second National Federal Savings Bank v. Inn at Canal Square Limited Partnership,* Del.Super., C.A. No. 91L–05–012.

4. Defs.' Op. Br. at App. at D–72 (Stipulation of Judgment), at ¶ 2.

5. In paragraph 2 of the 1991 Settlement Agreement, the revised payment schedule provides that the Borrower will make quarterly payments from 1991 to 1995, totaling $750,000. Paragraph 3 provides that the balloon payment would be due on December 31, 1995.

6. Guardian Realty Group, LLC was an entity of Ronald Hirsch and Eric Cummings, named defendants in Beal's second amended complaint. Reese Aff. Ex. 5 (Second Amended Complaint), at ¶ 64.

ment for affirmative relief is sought, has failed to appear, plead or otherwise defend as provided by these Rules, and that fact is made to appear," a default judgment may be entered against that party.[7] The Luckses did file a *pro se* answer to the initial complaint on January 14, 1997 but failed to file an answer to the second amended complaint. With respect to discovery, William Lucks took part in one deposition, yet the Luckses failed to answer six sets of interrogatories and other written discovery.

■ I am reminded that "the Court interprets the submissions of a *pro se* litigant with lenience."[8] Moreover, mere failure of a defendant to appear and actively engage in litigation does not necessarily entitle a plaintiff to entry of a judgment. In addressing a motion for a default judgment, Chancellor Allen stated in *Carlton Investments:*

> The effect of a default in answering is not to entitle the plaintiff to the judgment it seeks in the complaint. Even if a defendant fails to appear, for example, courts may not enter judgments under circumstances in which the well-pleaded allegations of the complaint show the plaintiff is entitled to no judgment. Nor may a court properly enter judgment in an amount sought in the complaint simply because defendant failed to appear. The court must be shown that plaintiff could produce a *prima facie* record that would entitle plaintiff to judgment in that amount. The effect of a default is

simply to admit all of the well-pleaded allegations of the complaint.[9]

I will address Beal's summary judgment motion with these standards in mind.

A motion for summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[10] In deciding on a motion for summary judgment, "the proponent of the motion has the burden to prove clearly the absence of any genuine issue of fact, and any doubt should be resolved against him."[11] Accepting Beal's well-pleaded allegations as true by reason of the Luckses' default, I am satisfied that there are no issues of material fact in question with respect to the amounts claimed under the 1985 Note and/or the 1993 Settlement Agreement and that Beal Bank is entitled to a judgment as a matter of law on this claim. Beal has withdrawn the remainder of its claims against the Lucks for specific performance under the 1993 Settlement Agreement.

## A. Motions for Summary Judgment on the 1987 Note

■ There are cross-motions for summary judgment pending involving all remaining claims in this litigation. Nevertheless, "the existence of cross-motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues."[12]

---

7. Ct. Ch. R. 55(b).

8. *Wellington v. Tower Hill School,* Del.Super., C.A. No. 97A–02–001, 1997 WL 717770, at *2, Gebelein, J. (Nov. 7, 1997) (Op. and Order).

9. *Carlton Investments v. TLC Beatrice International Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1996 Del.Ch. Lexis 97, at *1, Allen, C., 1996 WL 426501 (July 23, 1996) (Mem.Op.) (citation omitted).

10. Ct. Ch. R. 56(c).

11. *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

12. *United Vanguard Fund, Inc. v. TakeCare, Inc.,* Del.Supr., 693 A.2d 1076, 1079 (1997).

### 1. Are the Stephenses Liable as Makers on the 1987 Note?

In reviewing the claims under the 1987 Note against the Stephenses in their individual capacities, I turn first to the face of that instrument.[13] Under Delaware's version of Article 3 of the Uniform Commercial Code, a "maker" is "a person who signs or is identified in a note as a person undertaking to pay."[14] Beal argues that on the face of the Note, the Inn Partnership, the Luckses, and the Stephenses were makers of the 1987 Note because they are all persons who signed the Note undertaking to pay. Briefly, Beal's argument is (i) that the 1987 Note provides that "the undersigned ("Borrower") promise to pay," and (ii) that the Luckses, the Stephenses, and the Inn Partnership are the "undersigned" because they signed the note "below."

Beal's argument is unpersuasive because it does not account for the fact the 1987 Note defines the "undersigned" undertaking to pay by the limiting-parenthetical reference to the "Borrower" and then identifies only the Inn Partnership as the Borrower on its face. The signature block shows that "Borrower" was the Inn Partnership, not the four individuals. The signature block on the last page of the 1987 Note appears as follows:[15]

The Inn at Canal Square Limited Partnership

By: _____ (SEAL)
    William A. Lucks, Partner
    BORROWER

By: _____ (SEAL)
    Ronald L. Stephens, Partner
    BORROWER

_____ (SEAL)
William A. Lucks, Individual

_____ (SEAL)
Amanda Lucks, Individual

_____ (SEAL)
Ronald L. Stephens, Individual

_____ (SEAL)
Ellen P. Stephens, Individual [15]

Under the signature line for both "William A. Lucks, Partner" and "Ronald L. Stephens, Partner," the word "BORROWER" is typed in all capital letters. The word "Borrower" does not appear anywhere near the lines for William A. Lucks, Amanda Lucks, Ronald L. Stephens, and Ellen Stephens signing in their individual capacities. Thus, contrary to Beal's argument, a more plausible explanation of the terms of the 1987 Note is that only the Inn Partnership, as "Borrower," signed the Note "undertaking to pay."

This reading finds additional support by a reading of the note as a whole. The word "Borrower" appears throughout the note as the primary reference to the party bearing the obligations to pay. The note provides that the Borrower bears the responsibility of paying fees on late monthly payments. Additionally, provisions under the note are made to ensure adequate notice for the sake of the Borrower. The only place that the Borrower is identified

---

**13.** In *Derry Finance N.V. v. Christiana Cos.,* D.Del., 616 F.Supp. 544, n. 2 (1985), aff'd. 797 F.2d 1210 (3d Cir.1986), District Judge Latchum, though speaking on a case involving New York law, stated, "It is a common sense rule that promissory notes are a variety of contract and are to be so construed and enforced." *See also* 11 Am.Jur. § 126. Because the terms of the note are clear and unambiguous, the intent of the parties is "ascertained by giving the language its ordinary and usual meaning." *Northwestern National Insurance Company v. Esmark, Inc.,* Del. Supr., 672 A.2d 41, 43 (1996). Moreover, the terms of the note "must be construed as a whole, to give effect to the intentions of the parties." *Id.*

**14.** 6 *Del.C.* § 3–103(a)(5).

**15.** Defs.' Op. Br. at App. at D–89 (Note), at 3.

is in the signature block for the partnership. Of course, the general partners themselves did not become liable as makers merely by signing on behalf of the partnership. Because of the inclusion of the word "By:" in the signature blank, it is clear that the Inn Partnership was the Borrower, and general partners Lucks and Stephens (as agents) signed merely to bind the partnership.

The second problem Beal's argument encounters is that other terms of the 1987 Note show that the individuals are "identified in [the] note" as persons guarantying the indebtedness, not as "persons undertaking to pay." In the second paragraph of the Note, it states:

> The obligations evidenced by this Note are secured by ... a guarantee[16] of payment of even date herewith executed by William A. Lucks, Amanda Lucks, Ronald L. Stephens & Ellen P. Stephens jointly and severally in favor of Lender (the "Guarantee") and all of the terms and conditions of each such document of security, including expressly but without limitation those provisions regarding delinquent payments and the penalties therefore, are incorporated in and made part of this Note as if they were fully set out herein.[17]

In summary, Beal's argument turns on whether the individuals signing the notes were makers. Because it appears from the face of the note that the Luckses and the Stephenses signed the note as guarantors and not as individuals "undertaking to pay" the note, they are not makers, and Beal's argument fails.

■ Turning to the "Guaranty Agreement," paragraph 7 provides that the guaranty would be ongoing until the debt was paid in full, or "until public sewer has been approved and available to the [Inn] property." It appears from the summary judgment record that sewer service hook-up was approved and available to the Inn Property in 1988 before any default occurred on the 1987 Note, fulfilling the condition of paragraph 7 under the guaranty. Therefore, the guaranty expired, and the individuals had no further liability under the 1987 Note. In any case, Beal stipulated to the dismissal with prejudice of Count IV, thus conclusively terminating any residual liability of the Stephenses under the Guaranty.

Finally, Beal argues that the individuals' liability survived the Guaranty's expiration and its dismissal because the note provides that "[t]his Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns."[18] Undoubtedly, the note was the "joint and several obligation" of the guarantors, *so long as* they remained guarantors under the terms of the referenced Guaranty. After the condition of sewer hook-up in paragraph 7 of the agreement was fulfilled, the guarantors fulfilled their obligation under both the guaranty and the note. With the extinguishing of the Guaranty, the obligations of the individuals terminated. Certainly, nothing in this language suggests an intention to alter or amend the express language of the Guaranty.

Because the Stephenses in their capacities as individuals cannot be found to be makers and can no longer be held liable as guarantors under the 1987 Note, the claims against the Stephenses in their individual capacities under the 1987 Note are

---

16. Note that the two documents alternate between the spelling of "guaranty."

17. Defs.' Op. Br. at App. at D–89 (Note), at 1.

18. Defs.' Op. Br. at App. at D–89 (Note), at 2.

not sustainable. Therefore, I will enter summary judgment in favor of Ronald L. Stephens and Ellen Stephens in their capacities as individuals on the 1987 Note.[19]

## 2. *Claims against the Inn Partnership and General Partners*

Ronald Stephens (as general partner) and the Inn Partnership argue that summary judgment is appropriately entered in their favor because the 1991 Settlement Agreement contains a "Release of Liability" in paragraph 9. The "Release" states:

> RELEASE OF LIABILITY. The parties hereto specifically release each other and their agents, respectively, from any liability arising or which may arise from any actions or representations (unless said actions or representations constitute fraud) occurring to the date of this Agreement.[20]

Defendants maintain that "[t]his term of the document is unequivocal and completely releases the Inn Partnership, Second National, *and both their agents* from *any liability* arising prior to the entry of this Settlement Agreement." Beal Bank responds by asserting that "the Settlement Agreement did not release the Inn Partnership from the underlying obligation. To the contrary, as a condition to the Settlement Agreement, the Inn Partnership was required to stipulate to judgment on the underlying obligation." Moreover, plaintiff points out that the 1991 Settlement Agreement contains language that reserved the bank's right to proceed against Stephens. Once again, turning to the language of the agreement, it states in paragraph 8:

> NO OTHER PROCEEDINGS. So long as Borrower is in compliance with the terms of this Agreement, and other loan documents heretofore executed, (except as modified herein), Lender will not undertake any proceedings against any of the individual obligees under the Note executed by Borrower on July 1, 1987 [emphasis added].[21]

Recognizing that neither Mr. Stephens nor any of the other individuals who signed the 1987 Note were ever "obligees" under that Note, Beal terms this "an obvious typographical error" and urges me to read "obligors" instead. Defendants argue first that the instrument must be read as it is written and that, in any case, the clause is meaningless because, at the time of the 1991 Settlement Agreement, the obligations of the individuals had expired.

As stated in *Cantera v. Marriott Senior Living Services*, "Summary judgment is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact. Rather a determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." [22] When terms within an agreement are susceptible to varying interpretations, the terms of the contract are deemed ambiguous,[23] and parties may present extrinsic evidence as to the parties' intent. Both the "Release" and the "Reservation of Rights" may be

---

19. Because of the preclusive effect of the Luckses' discharge in bankruptcy, no claim is brought against them under the 1987 Note.

20. Defs.' Op. Br. at App. at D–72 (Settlement Agreement), at ¶ 9.

21. Defs.' Op. Br. at App. at D–72 (Settlement Agreement), at ¶ 8.

22. Del.Ch., C.A. No. 16498, 1999 WL 118823, at *3, Lamb, V.C. (Feb. 18, 1999) (Mem.Op.).

23. See *Rhone–Poulenc v. American Motorists Insurance Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992) (stating that the terms of a contract are ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings").

susceptible to the more than one interpretation, as argued by the parties' counsel. Because I conclude that it may be helpful in deciding these questions to hear the trial evidence, I will defer decision on these questions until trial. Thus, I will deny without prejudice defendants' motion for summary judgment on the liability of the Inn Partnership and Mr. Stephens as General Partner.

### 3. The D'Oench Duhme Doctrine

Beal Bank argues that defendants cannot raise the 1991 Settlement Agreement to diminish or defeat Beal's rights under the 1987 Note because the *D'Oench Duhme* doctrine precludes it.[24] Briefly summarized, "[t]he *D'Oench Duhme* doctrine prohibits the maker of a promissory note from asserting a defense based on any agreement that would tend to deceive the FDIC."[25] The United States Supreme Court created this rule of law to protect the FDIC from "secret agreements which tend to misrepresent the value of bank's assets."[26] Case law supports the application of *D'Oench Duhme* in situations where the agreements are oral[27] or otherwise tend to misrepresent the value of banks' assets.[28] Congress "essentially"[29] codified

*D'Oench Duhme*, by adopting 12 U.S.C. § 1823(e)(1), which states:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been, continuously, from the time of its execution, an official record of the depository institution.[30]

Beal Bank seizes on the word "agreement" in the language of *D'Oench* and § 1823(e), arguing that the 1991 Settlement *Agreement* that the Inn Partnership and SNFSB executed cannot "diminish or

---

24. See *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

25. *FDIC v. Betancourt*, S.D.N.Y., 865 F.Supp. 1035 (1994).

26. Marsha Hymanson, Note, *Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail*, 62 S. Cal. L.Rev. 253, 255 (November 1988).

27. See *Beal Bank v. Pittorino*, 1st Cir., 177 F.3d 65, 68 (1999) (citing *D'Oench Duhme* for the proposition that because a statement by the FDIC was not in writing, estoppel could not be argued).

28. See *Betancourt*, 865 F.Supp. at 1040. See also *RTC v. Daddona*, 3d Cir., 9 F.3d 312, 319 (1993).

29. See *John v. Resolution Trust Co.*, 7th Cir., 39 F.3d 773 (1994) for a more complete examination of the distinctions between the *D'Oench Duhme* doctrine and 12 U.S.C. § 1823(e). "The common law *D'Oench* doctrine and its statutory counterparts are frequently analyzed together and likely serve identical aims (Justice Scalia relied on *D'Oench* in his analysis of the scope of § 1823(e) in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340). The two, however, may not be co-extensive." *Id.* at 776.

30. 12 U.S.C. § 1823(e).

defeat" Beal's right to collect under the 1987 Note, despite the fact that the 1991 Settlement Agreement was an integral part of a judgment entered by the Delaware Superior Court, a judgment which cannot be given effect without reference to the terms of that agreement. According to Beal, "If a borrower is unable to provide evidence meeting all the foregoing criteria [i.e., § 1823(e)], any claim based on an agreement is invalid." [31]

After investigating the relevant law, I have strong doubts as to the validity of Beal's arguments. Beal has not been able to cite a single case applying *D'Oench* or § 1823(e) to preclude giving effect to the terms of a final, unappealable judgment. Rather, as would be expected, Beal's authorities relate to the application of § 1823(e) to "side" agreements (typically non-public agreements made between bank officers and the obligors/guarantors) made at the time of or after the creation of the loans. Federal law, however, recognizes that judgments are inherently different from secret side agreements and directs that the FDIC and the RTC abide by them. 12 U.S.C. § 1821(d)(13)(A) states, "The [FDIC or RTC] shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the [FDIC or RTC] as conservator or receiver." [32] Beal obtained the 1987 Note after the Superior Court's judgment became final and unappealable and is bound by that judgment.

The question is whether the 1991 Settlement Agreement is so integrally part of the judgment as to avoid the effect of *D'Oench.* The judgment, in form, is an *in rem* judgment allowing SNFSB to foreclose on the Inn Property. The underlying action was initiated *"sci fa sur mortgage"* and proceeded as a simple *in rem* action. Had SNFSB proceeded to foreclosure without any agreement to modify the terms of the note, the *in rem* judgment on the mortgage would not have operated as an adjudication of the bank's rights under the note.[33] Nor would such a simple judgment of foreclosure ordinarily result in any modification of the terms of the underlying note.

But, instead of proceeding to a foreclosure sale, SNFSB and the Inn Partnership negotiated and agreed to a hybridized judgment that operated both as an *in rem* judgment of foreclosure and, by its reference to and incorporation of the terms of the 1991 Settlement Agreement, a substantial modification of the personal rights of the bank and the obligations of the partnership under the old note. Indeed, one cannot give effect to the judgment without giving effect to the terms of the 1991 Settlement Agreement. The judgment states, "Execution on said Judgment may only proceed pursuant to the terms of a certain Settlement Agreement entered into between Plaintiff and the Defendant dated May 31, 1991, the terms of which are incorporated herein by reference there-

---

31. Pl. Reply Br., 4.

32. 12 U.S.C. § 1821(d)(13)(A).

33. Defendants argue that modern principles of *res judicata* and the policy against claim splitting required SNFSB to bring all of its claims against the Inn Partnership (including any future claim for a deficiency resulting from the foreclosure) in the same action.

Thus, they argue, the effect of the judgment was to preclude any further claim against the partnership (and, indirectly against Mr. Stephens as general partner) under the 1987 Note. I reject this argument and the suggestion the admittedly *in rem* judgment entered by the Superior Court can or should be given collateral effect on the bank's personal claims against any person liable on the 1987 Note.

to." [34]

From this, it is clear that, after entry of the judgment, SNFSB had no right to proceed against the Inn Partnership under the 1987 Note independently of the 1991 Settlement Agreement. That is, as between the bank and the partnership, the old note could only be enforced to the extent its terms were incorporated into the judgment and the 1991 Settlement Agreement. For example, as mentioned before, the 1991 Settlement Agreement replaced the payment terms of the 1987 Note with new terms. Thus, the Inn Partnership's subsequent failure to perform the payment terms of the Settlement Agreement gave rise to a claim under the Settlement Agreement, not the Note.

Beal's *D'Oench* argument is further compromised by its significant reliance on the terms of the 1991 Settlement Agreement throughout the course of this litigation. Beal became a party to the 1991 judgment, having moved successfully to substitute in for SNFSB as plaintiff. Thereafter, Beal exercised SNFSB's rights under the judgment and caused the Inn Property to be sold at a public sale. Under the terms of the judgment, Beal could only have done so "pursuant to the terms" of the very 1991 Settlement Agreement it now says have no effect on its rights. Similarly, I cannot avoid observing that Beal also relies on the terms of that agreement in its damages calculation. First, Beal insists that the partnership and Mr. Stephens are bound by the statement in the "Whereas" clause of the 1991 Settlement Agreement of the amount due and owing as of March 31, 1991. Next, Beal calculates how much was due to be paid under that agreement, not the old note, before December 31, 1995 and credits defendants with amounts paid under the terms of the Settlement Agreement. Beal then calculates how much should have been paid on December 31, 1995 under the 1991 Settlement Agreement and adds interest and other costs from that date. Finally, Beal credits defendants with the net proceeds of the foreclosure sale it obtained under the terms of the judgment.

Plaintiff's reading of § 1823(e) is also far too literal. The Supreme Court's holding in *Langley v. FDIC* [35] states that two purposes of § 1823 is (i) "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets," and (ii) require contemporaneous recording along with board approval to ensure "mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." In the absence of evidence— wholly missing here—that the 1991 judgment was the product of fraud, misrepresentation or other misconduct,[36] I must give effect to the 1991 judgment and the terms of the 1991 Settlement Agreement that is inextricably made a part of that judgment.

Nevertheless, rather then decide conclusively at this time the issue of *D'Oench Duhme*'s applicability, I will defer that issue until trial. I invite the parties to present whatever competent and relevant evidence they have relating to the execution of the 1991 Settlement Agreement, the condition of SNFSB's files relative thereto, and whatever other issues they

**34.** Defs.' Op. Br. at App. at D–70 (Stipulation of Judgment), at ¶ 2.

**35.** 484 U.S. 86, 91–2, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

**36.** *See* Chancery Court Rule 60(b).

believe bear on the enforceability of the 1991 Settlement Agreement against Beal.

## IV.  Conclusion

I conclude that Beal is entitled to summary judgment with respect to its claims against the Luckses on the 1985 Note and the 1993 Settlement Agreement. With regard to the 1987 Note, I conclude (i) that when they signed the 1987 Note in their individual capacity, Mr. and Mrs. Stephens signed only in their capacity as guarantors, and (ii) their obligations as guarantors were discharged in 1988. Finally, I reserve for trial the question whether the 1991 Settlement Agreement discharged Mr. Stephens from all further liability, including liability as general partner for the Inn Partnership's default in performance of the 1991 Settlement Agreement.